# IN THE SUPREME COURT OF IOWA

No. 08–1729

Filed December 30, 2010

**CURT DANIELS,**

　　Appellant,

vs.

**JOHN HOLTZ; WSH PROPERTIES LLC;
NAVAJO ASSOCIATES, LLC,
JOHN DOES** and **JANE ROES 1–5,**

　　Appellees,

**JAMES NERVIG** and **BRICK, GENTRY,
BOWERS, SWARTZ, STOLTZE and
LEVIS, P.C.;**

　　Appellees,

**HUNTERS RETREAT, LLC,**

　　Appellee.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Lucas County, Carla T. Schemmel, Judge.

Plaintiff appeals district court grant of summary judgment and argues sheriff's sale should be set aside for grossly inadequate price and unfair conduct. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED.**

Curt N. Daniels, pro se, Chariton, for appellant.

Billy J. Mallory of Brick Gentry P.C., West Des Moines, for appellees John Holtz, WSH Properties, LLC, and Hunters Retreat, LLC.

Kermit B. Anderson of Finley, Alt, Smith, Scharnberg, Craig, Hilmes & Gaffney, P.C., Des Moines, for appellees Nervig and Brick, Gentry, Bowers, Swartz, Stoltze and Levis, P.C. (Brick Law Firm).

**STREIT, Justice**.

"Won't you be my neighbor?"[1] Curt Daniels, the owner of a corporation sold at a sheriff's sale, seeks to have the sale set aside because, he argues, it lacked a just appraisal, the appraisers were not "disinterested householders of the neighborhood," and the property sold for a grossly inadequate price. Iowa Code § 626.93 (2005). Daniels argues it is improper to adjust the appraisal of a corporation to take account of capital gains tax liability. Daniels also argues the sale should be set aside because it was unfairly or fraudulently conducted. The district court granted summary judgment in favor of defendants. We reverse the district court in part and hold Daniels raised a genuine issue of material fact regarding alleged inappropriate behavior at the auction that may have affected the selling price. In all other respects, we affirm the district court, including the propriety of discounting the value of the corporation in view of capital gains tax liability on the corporation's major asset.

## I. Background Facts and Prior Proceedings.

This case arises from long-brewing hostility between Curt Daniels and John Holtz. Holtz operates two Arizona limited liability companies, WSH Properties, LLC and Hunters Retreat, LLC. Daniels previously operated two hog lots, one in Jasper County and one in Lucas County. Both properties were owned by an Iowa corporation owned and controlled by Daniels called Indian Creek Corporation (ICC). In 1998, WSH Properties and John Holtz purchased the Jasper County property out of a tax-sale auction after ICC failed to pay the property taxes on the Jasper County property. After the sale, Daniels removed certain items from the

---

[1]Fred Rogers sang the song "Won't You Be My Neighbor" at the beginning of his popular children's show: Mister Rogers' Neighborhood.

Jasper County property. WSH Properties brought a replevin suit against ICC and Daniels regarding the removed property, won a jury verdict finding it was entitled to possession of the disputed property, and was awarded $246,000 in damages.[2] In 2001, the State of Iowa obtained a judgment of $95,000 against Daniels and ICC based on waste-control violations at the Jasper County property.

In 2006, the state assigned the $95,000 judgment to Hunters Retreat LLC, another company owned by Holtz, in exchange for a cash payment of $95,000. In order to execute on the judgment, Hunters Retreat filed a praecipe for issuance of a writ of general execution on the judgment seeking the sale of the "right, title, and interest of Curt Daniels individually and as owner in Indian Creek Corporation, including but not limited to any certificated or uncertificated stock ownership, corporate books and records regarding said Indian Creek Corporation." The Lucas County Sheriff published and served notice of a sheriff's sale, setting the date for a public sale of ICC.

Pursuant to Iowa Code section 626.93, three appraisals of ICC were provided to the Lucas County Sheriff. ICC's main asset is a parcel of real estate consisting of farmland in Lucas County, Iowa. P.A. Henrichsen, an attorney and certified public accountant (CPA) with an office in West Des Moines, was selected by Hunters Retreat and provided an appraisal of ICC stock at $52,000. Henrichsen based his appraisal on 2005 bankruptcy schedules filed under oath for ICC by Daniels, which estimated the value of ICC at $104,000 ($952,000 in assets less

---

[2]On appeal, the court of appeals vacated the jury verdict and remanded for a new trial because it found the jury had acted based on passion and anger. On further review, this court reinstated the jury verdict because there was an evidentiary basis for the verdict, but agreed the amount of damages should remain at the $246,000 set by the district court. *WSH Props., L.L.C. v. Daniels*, 761 N.W.2d 45, 51–52 (Iowa 2008).

$849,000 in liabilities). Henrichsen then adjusted the bankruptcy schedule to increase the value attributed to the land by $150 per acre, decrease the value for assets no longer in ICC's possession, decrease the value to account for a mortgage balance that was higher than reflected in the bankruptcy filing, and decrease the value based on the $246,000 WSH judgment. Leland Shelton, a licensed real estate agent with an office in Chariton, Iowa, was selected by Daniels and appraised the value of the ICC stock at $769,000. Shelton determined the only valuable asset of the corporation was 1219 acres of real estate that he valued at $1,643,821. He then discounted that amount based on two mortgages— one with a remaining balance of $319,617.53 and one with an original principal of $127,685.31—and the $246,000 WSH judgment.

Based on the disagreement between Henrichsen and Shelton, Wendy Sims, a CPA with offices in Des Moines and Pella, was selected by the Lucas County Sheriff to provide a third appraisal. Sims appraised the value of the ICC stock at $29,500. Sims's written appraisal valued 1225 acres of farmland at $1,592,500. Sims then subtracted known liabilities of ICC: an outstanding mortgage of $330,481.95, another outstanding mortgage of $175,000, the WSH judgment of $246,000, and $20,000 in estimated court costs for a pending appeal. This brought the property appraisal down to $821,018.05. Sims then applied a twenty-five percent reduction to the $821,018.05 based on an assessment of unknown liabilities that might exist within the corporation because Sims was unable to review any corporate books or records. Sims then noted a large potential tax liability that would occur on the sale of the property. ICC originally paid $420,000 for the property and Sims estimated the property was now worth $1,592,500. The increase in value is a taxable gain of $1,172,500, which would result in an estimated capital gains tax

liability of $586,250 upon sale. After discounting the estimated tax liability, Sims concluded a just appraisal of the ICC stock was $29,500.

Prior to the scheduled sale of ICC, Henrichsen and Shelton had the opportunity to review Sims's appraisal. Henrichsen and Shelton both decided they agreed with Sims's valuation. Henrichsen wrote, "Sheriff Longley I agree with the 29,500 value" and signed his name. Shelton wrote, "I have review [sic] this appraisal and I agree with this" and signed his name.

At the sheriff's sale, John Holtz, on behalf of Hunters Retreat, and Monroe Branstad bid on the ICC stock. Holtz placed the highest bid at $110,000. After Holtz's bid of $110,000, the sheriff took a recess, and after the recess, Branstad informed the sheriff he would not bid any further. Branstad testified in a deposition that he planned to bid higher on the property but, "It made me apprehensive or nervous that Mr. Holtz kept saying that this thing has got so many things wrong with it that you don't want to touch it." Branstad also testified in a deposition that during the recess Holtz asked him what his limit was and offered to partner with Branstad on the property but refused to follow through on the partnership offer after the sale.

Daniels filed the instant suit against John Holtz and other entities and individuals somehow connected to the ongoing dispute between Holtz and Daniels, alleging a variety of claims including conspiracy, fraud, denial of equal treatment, unjust enrichment, intimidation, slander, and abuse of process. Daniels asked the district court to declare the sheriff's sale void, enjoin the defendants from interfering with his leasehold interest in the property, and award him actual and punitive damages. The defendants moved for summary judgment. Daniels moved to amend his petition to add nine causes of action, including deceit and

collusion by the parties and their attorneys. The district court granted the defendants' motions for summary judgment and denied the motion to amend.

Daniels sought review. The court of appeals found the sale did not have a "just appraisal" as required by statute because the appraisers should not have factored in the potential capital gains tax liability. The court of appeals denied Daniels's other claims of error. Both defendants and Daniels seek further review.

## II.  Scope of Review.

We review a district court grant of summary judgment for correction of errors at law. *Parish v. Jumpking, Inc.*, 719 N.W.2d 540, 542 (Iowa 2006). Summary judgment is proper only where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Iowa R. Civ. P. 1.981(3). This court reviews the record in the light most favorable to the nonmoving party. *Lloyd v. Drake Univ.*, 686 N.W.2d 225, 228 (Iowa 2004). All legitimate inferences will be drawn in favor of the nonmoving party. *Tetzlaff v. Camp*, 715 N.W.2d 256, 258 (Iowa 2006). Denial of a motion to amend will only be reversed where a clear abuse of discretion is shown. *M–Z Enters., Inc. v. Hawkeye-Sec. Ins. Co.*, 318 N.W.2d 408, 411 (Iowa 1982).

## III.  Merits.

Defendants sought summary judgment of Daniels's claims that the $95,000 assignment by the State of Iowa to Hunters Retreat was invalid and the sheriff's sale was illegal and invalid. The district court granted summary judgment in favor of defendants on all of Daniels's claims. Daniels raises three points on appeal. First, Daniels argues the district court should not have granted summary judgment regarding whether the sheriff's sale complied with statutory requirements. Second, Daniels

argues the district court should not have granted summary judgment regarding whether the defendants engaged in acts that would require the sheriff's sale to be set aside. Third, Daniels argues the district court abused its discretion by failing to grant his motion to amend his petition.

**A. Just Appraisal.** A sheriff's sale may be set aside by a court "where the price obtained at a sheriff's sale is so grossly inadequate as to amount to unfairness or oppression." *Buter v. Slattery*, 212 Iowa 677, 680, 237 N.W. 232, 233 (1931). Iowa Code section 626.93 sets forth requirements for conducting sheriff's sales:

> Personal property . . . must be appraised before sale by two disinterested householders of the neighborhood, one of whom shall be chosen by the execution debtor and the other by the plaintiff . . . who shall forthwith return to said officer a just appraisement, under oath, of said property if they can agree; if they cannot, they shall choose another disinterested householder, and with that householder's assistance shall complete such appraisement, and the property shall not, upon the first offer, be sold for less than two-thirds of said valuation; but if offered at the same place and hour of the day as advertised upon three successive days, and no bid is received equal to two-thirds of the appraised value thereof, then it may be sold for one-half of said valuation.

Daniels contends the sheriff's sale is invalid because there was no "just appraisement" from disinterested householders, and the sale of ICC was not for two-thirds of the value of a just appraisal. Daniels argues Sims's appraisal of $29,500 was not "just" because it discounted the value of the corporation based on potential capital gains tax liability. The main asset of ICC is land (the Lucas County property). Because ICC paid $420,000 for the property originally and, as Sims, Henrichson, and Shelton estimated, respectively, the property was now valued at around $1,592,500, $1,004,000, or $1,643,821, a sale would result in a large profit subject to taxation.

The court of appeals agreed with Daniels and held it was improper for the appraisers to discount the stock based on the capital gains tax liability. The court based its ruling on *In re Marriage of Friedman*, 466 N.W.2d 689 (Iowa 1991), a marriage dissolution case. *Marriage of Friedman*, 466 N.W.2d at 691. In *Friedman*, we held it was improper for a trial court to discount the value of stock in dividing property between former spouses, where one spouse would be retaining all of the stock because it was a family-owned business. *Id.* We held that because there was "no evidence that a sale was pending or even contemplated . . . the effect of considering income tax consequences on a sale is to diminish the asset value to the nonowning spouse." *Id.*

Federal case law has recently grappled with whether valuation of corporate assets in the context of estate and gift tax should take capital gains tax liability into account. Prior to 1986, capital gains tax liability could be avoided by liquidating a corporation based on *General Utilities & Operating Co. v. Helvering*, 296 U.S. 200, 206, 56 S. Ct. 185, 187, 80 L. Ed. 154, 157 (1935), which held a corporation did not recognize a taxable gain on a dividend distribution of appreciated property. The Tax Reform Act of 1986 abrogated *General Utilities*, and removed a corporation's ability to avoid the capital gains tax. *Eisenberg v. Comm'r*, 155 F.3d 50, 54–55 (2d Cir. 1998). Prior to 1986, corporate valuations did not consider capital gains taxes because the taxes could be avoided. Recent case law has shifted this approach.

The Second Circuit concluded capital gains tax liability should be considered, noting

> a hypothetical willing buyer, having reasonable knowledge of
> the relevant facts, would take some account of the tax
> consequences of contingent built-in capital gains on the sole

asset of the Corporation at issue in making a sound valuation of the property.

*Id.* The court further explained, "The issue is not what a hypothetical willing buyer plans to do with the property, but what considerations affect the fair market value of the property he considers buying." *Id.*

The Fifth Circuit held an asset-based approach to valuation should always, as a matter of law, account for capital gains tax liability. *Dunn v. Comm'r*, 301 F.3d 339, 352–54 (5th Cir. 2002). *Dunn* explained that under the asset-based approach, the value of a corporation is grounded in the fair market value of its assets and liabilities, which are determined by applying the hypothetical willing buyer and willing seller test. *Id.* at 353. When applying the hypothetical willing buyer and willing seller test, the basic assumption is the assets will be sold. *Id.* *Dunn* noted that a separate valuation approach—known as the earnings or cash-flow approach—assumes the assets will be retained and therefore would not discount the capital gains tax liability. *Id.*

The Eleventh Circuit also held valuation of a corporation should be discounted for capital gains tax liability. *Estate of Jelke v. Comm'r*, 507 F.3d 1317, 1333 (11th Cir. 2007). *Estate of Jelke* noted the "hypothetical willing buyer is a rational, economic actor" and

> [c]ommon sense tells us that he or she would not pay the same price for identical blocks of stock, one purchased outright in the marketplace with no tax consequences, and one acquired through the purchase of shares in a closely-held corporation, with significant, built-in tax consequences.

*Id.*

Daniels argues case law supporting a reduction based on capital gains tax liability does not consider the potential application and use of a section 1031 exchange. Section 1031 of the United States Internal Revenue Code provides that capital gains tax may be deferred in certain

circumstances where property is exchanged for property "of like kind." 26 U.S.C. § 1031(a)(1) (2006). The policy behind this deferral is the taxpayer has not received anything that can be used to pay taxes because the property was simply exchanged for property of like kind. The basis of the old property becomes the basis of the new property, with adjustments. *Id.* § 1031(d). Therefore, the gain is still locked up in property—just a different property—and the taxpayer has not realized a gain for tax purposes.

The IRS issued a fact sheet regarding 1031 exchanges. FS–2008–18, issued in February 2008, explains that a section 1031 exchange "allows you to postpone paying tax on the gain" and that "[g]ain is deferred, but not forgiven, in a like-kind exchange." *See Like-Kind Exchanges Under IRC Code Section 1031,* IRS.gov, (Feb. 2008), http://www.irs.gov/newsroom/article/0,,id=179801,00.html. As the fact sheet explains, "When the replacement property is ultimately sold (not as part of another exchange), the original deferred gain, plus any additional gain realized since the purchase of the replacement property, is subject to tax." *Id.* Because a like-kind property exchange only defers tax liability, it does not necessarily affect a fair market value appraisal using an asset-based approach.

We conclude Daniels failed to raise a genuine issue of material fact regarding whether the ICC appraisal was unjust because it discounted the capital gains tax liability. Discounting capital gains tax liability is an accepted part of an asset-based methodology for valuation and has been approved by numerous federal courts. Daniels's argument that it was improper to consider the tax liability because there was no evidence of an impending sale of the land does not change our conclusion. The asset-based approach to valuation assumes a hypothetical rational economic

buyer and we agree that in this circumstance, a hypothetical buyer of stock would take into account any tax liabilities of the corporation.

We do not hold appraisals of corporate assets must, as a matter of law, discount any capital gains tax liability. Instead, the determination required of our courts is whether the sheriff's sale obtained a "just appraisement." Iowa Code § 626.93. We refrain from establishing a blanket rule imposing a particular appraisal methodology.

There may be circumstances where a discount for capital gains tax liability leads to an unjust appraisal or a grossly inadequate price at auction based on a failure to follow accounting principles. Here, Daniels has not provided any evidence to suggest Sims deviated from accounting principles. In fact, the other two appraisers agreed with Sims's methodology. As Henrichsen explained during his deposition, although he agreed there are various techniques to avoid the $600,000 capital gains tax and there may be buyers out there who would attempt to utilize those techniques, "it would be wrong for [Sims] to assume that that particular one was the buyer or would be the buyer. She needs to assume the average Joe buyer." Further, Sims is a CPA and Daniels has not challenged her qualifications, other than to suggest she does not live and work close enough to the property to be considered a "householder," an argument we will address below.

Daniels makes an additional argument: the appraisals failed to meet the statutory requirements because they were not completed by "householders of the neighborhood." *Id.* Two of the three appraisers do not live or work in Lucas County. Henrichsen has an office in West Des Moines. Sims has offices in the Des Moines area and Pella. Henrichsen and Sims were asked to appraise the value of ICC, an Iowa corporation, licensed to do business in the state of Iowa. This appraisal was not

simply limited to one piece of property, but of the corporation that owned the property. Henrichsen and Sims both live and work in Iowa, and this court considers them to be householders of the neighborhood for purposes of evaluating the value of an Iowa corporation.

Section 626.93 requires the appraisers to be "householders of the neighborhood" to ensure the appropriate level of familiarity with the fair market value of the appraised property. This court held, in 1874, that an appraiser who lived thirty-five miles from the land in question was not a householder of the neighborhood. *Woods v. Cochrane*, 38 Iowa 484, 485 (1874). The dispute in *Woods* demonstrates the problem section 626.93 seeks to address: an unfairly low appraisal from an appraiser unfamiliar with the "neighborhood." The out-of-town appraiser in *Woods* valued the property at $1360, but the plaintiff offered five witnesses who all appraised the land at approximately $2880. *Id.*

As we noted in *Woods*, however, "the word neighborhood is a relative and indefinite term." *Id.* The circumstances that existed in 1874 are dramatically different when compared with the circumstances of 2010. The appraiser in *Woods* traveled the thirty-five miles by railroad and then buggy to visit the land in question. *Id.* The Des Moines area and Pella are both within sixty miles of Chariton, Iowa. A distance of thirty-five miles—or sixty miles—is no longer a substantial distance requiring travel by railroad and buggy. Since 1874, there have been advancements in travel, communications, and large-scale farming. The facts in this case are illustrative of the shift to larger farms, which results in larger "neighborhoods." Daniels farmed properties in Jasper and Lucas Counties, two Iowa counties that do not border each other. The Lucas County property at issue in this dispute is approximately 1225 acres.

Additionally, the instant dispute focuses on the propriety of factoring in capital gains tax liability to appraise an Iowa farm corporation and is not limited to the appraised value of land. CPAs located in the Des Moines area and Pella are geographically close enough to be "householders of the neighborhood" for this purpose because they are experts who, thanks to advancements in communications, journals, and seminars, can be expected to be qualified on factors relevant to appraising an Iowa farm corporation, including assessing mortgages and tax law.

Daniels also argues Shelton was not a "disinterested" appraiser. On July 20, 2006, the same date on which Shelton submitted his appraisal and six days before the sheriff's sale, Shelton sent a fax to Verle Norris, an attorney whose wife Shelton had entered into business arrangements with previously. The fax stated, "We need to keep on top of this. Will be buying this farm in one year." Shelton testified he made this statement "[b]ecause the farm has been up for sale before, and [he] figured the court case would bring it to a head." Shelton also testified he did not consider bidding at the sheriff's sale auction.

A disinterested person is one without pecuniary interest. *See Cent. Life Ins. Co. v. Aetna Cas. & Sur. Co.*, 466 N.W.2d 257, 261 (Iowa 1991). In *Central Life*, we set aside an appraisal award, which was adopted by an appointed "umpire," because the appraiser received a fee contingent on the amount of the award and therefore had a "direct financial interest in the dispute." *Id.* at 260–62. The appraisal was over $500,000 higher than another appraisal. *Id.* at 258. We held that this "concealed pecuniary interest in the outcome is a sufficient ground for voiding the award as a matter of law without a showing of prejudice." *Id.* at 262.

Here, however, Shelton did not have a *direct* pecuniary interest. Instead, should an asset of ICC be offered for sale in the future, Shelton was interested in purchasing that asset. This more attenuated interest does not require setting aside the sale under these circumstances. Daniels does not complain that Shelton's original appraisal was too low and instead relies, in part, on this appraisal. Daniels does object to Shelton's eventual agreement with the appraisal presented by Sims. Daniels argues Shelton may have decided to agree with Sims because of his personal interest. However, we have just rejected the argument that the Sims appraisal was "unjust." The key distinction between the Shelton and Sims appraisals—and that about which Daniels complains—is Sims's decision to discount the capital gains tax liability of ICC. We agree with Sims that it was not improper in this instance to discount the tax liability. Daniels does not suggest the Sims appraisal was too low for any other reason. Although we do not condone Shelton's behavior, and in other circumstances it might require the vacation of a sheriff's sale, Daniels has not presented an argument to support overturning this sale.

**B. Interference at the Sale.** Daniels argues the sheriff's sale should be set aside because of interference by Holtz with the sale. We have previously held, "It is a familiar rule that where the price obtained at a sheriff's sale is so grossly inadequate as to amount to unfairness or oppression, a court of equity may interfere and vacate and set aside the execution sale." *Buter*, 212 Iowa at 680, 237 N.W. at 233. The defendants argue, based on *Buter*, that this court is limited to reviewing whether the price was "grossly inadequate." Because the price obtained at the sheriff's sale was greater than the appraisal, defendants argue this court must uphold the sale.

Although the quote in *Buter* focused on the price reached at the auction, many courts also separately focus on the fairness of the process of a judicial or sheriff's sale. Courts will invalidate judicial sales if " 'there was fraud, unfairness or mistake in the conduct of the sale . . . *or* . . . the price brought at the sale was so grossly inadequate as to shock the conscience of the court.' " *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564 (8th Cir. 1997) (emphasis added) (quoting *In re Stanley Eng'g Corp.*, 164 F.2d 316, 318 (3d Cir. 1947)). *In re Chung King, Inc.*, 753 F.2d 547, 550–51 (7th Cir. 1985), the Seventh Circuit Court of Appeals considered whether a bankruptcy court properly set aside the sale of a debtor's property. The court separately addressed whether the sale could be set aside for either (1) a grossly inadequate sales price or (2) "the basis of compelling equities arising out of 'fraud, mistake or a like infirmity.' " *Chung King*, 753 F.2d at 550–51 (quoting *In re Webcor, Inc.*, 392 F.2d 893, 899 (7th Cir. 1968)). There the court found fraud, mistake, or a like infirmity could be the basis to set aside a sale. *Id.* at 551.

In this context, courts also provide, a sheriff's sale cannot be set aside for irregularity, unfairness, or fraud without a demonstration of prejudice. *See Goldberg v. Frick Elec. Co.*, 770 A.2d 182, 194 (Md. 2001) ("[Our sister states] have found that [sheriff's or judicial] sales may be set aside when, there has been some form of misrepresentation or mistake, *creating a prejudicial effect.*" (Emphasis added.)); *cf. Farmers Sav. Bank v. Gerhart*, 372 N.W.2d 238, 244 (Iowa 1985) (holding in the context of mistake of law or fact, that "relief should be granted only when enforcement of the sale would impose an oppressive burden on the party seeking vacation").

Therefore, we believe a price obtained at a sheriff's sale that is so grossly inadequate as to amount to unfairness or oppression is not the only basis for a court to set aside the sale. Accordingly, we hold that even without a grossly inadequate price, a court may set aside a sheriff's sale for irregularity, unfairness, or fraud causing a prejudicial effect on the sale.

Daniels contends there was fraud or unfairness in the sheriff's sale because Holtz discouraged Branstad from bidding above $110,000 by claiming there were numerous problems with the stock and by falsely offering to become business partners with Branstad. Branstad testified in a deposition that Holtz told him:

> [T]his farm is not going to have a clear title, there is no way it's going to be cleaned up, the title. The shares are convoluted, is what he called it. And that there could be as much as a million dollar lien on it, and that the books had been—he said suspiciously disappeared beforehand.

Branstad testified he didn't think Holtz "could have tried much harder to discourage than what he said. He was as negative as he possibly could [be] on all aspects of the farm."

Branstad asked for a recess in the bidding at $110,000 because "it made [him] apprehensive or nervous that Mr. Holtz kept saying that this thing has got so many things wrong with it that you don't want to touch it." Branstad testified that during the recess, Holtz approached him and asked how high he intended to bid, and how much it would cost for Branstad not to bid anymore. Branstad testified that he told Holtz he believed it would be illegal to accept payment in exchange for ceasing to bid, and Holtz said he wasn't offering to do so, he was just asking. Branstad said he would only stop bidding when he ended up owning the farm and Holtz then offered to partner with him. After the sale, Branstad

met up with Holtz, and Holtz told him they had broken the law, could not be partners on the corporation, and refused to talk to Branstad any further about the partnership agreement.

Daniels argues Holtz's behavior raises a question of fact regarding whether there was fraud or unfairness in the bidding process that requires the sale to be set aside. A number of courts have held interference with the competitive nature of the bid may require vacation of a judicial sale. As the United States Supreme Court explained,

> it is quite uniformly the rule in this country, as in England, that while equity will not set aside a sale for mere inadequacy of price, it will do so if the inadequacy is so great as to shock the conscience *or if there are additional circumstances against its fairness, such as chilled bidding.*

*Gelfert v. Nat'l City Bank of N.Y.,* 313 U.S. 221, 232, 61 S. Ct. 898, 902, 85 L. Ed. 1299, 1303 (1941) (emphasis added).

In *Cocks v. Izard,* 74 U.S. 559, 561–62, 19 L. Ed. 275, 276 (1868), the United States Supreme Court set aside a judicial sale where a tenant falsely claimed to be bidding on the landlord's behalf and was able to convince others not to bid based on this misrepresentation. The court stated:

> The law will not tolerate any influences likely to prevent competition at a judicial sale, and it accords to every debtor the chance for a fair sale and full price; and if he fails to get these, in consequence of the wrongful interference of another party, who has purchased his property, at a price greatly disproportioned to its value, equity will step in and afford redress, either by setting aside the proceedings under the sale, or by holding the purchaser to account.

*Cocks,* 74 U.S. at 562, 19 L. Ed. at 276.

Mere discussions between bidders or agreements to become partners at a judicial sale are not per se wrongful. *Magic City Amusement Co. v. Hastings,* 116 P.2d 709, 711 (Okla. 1941). Bidders are

allowed to "make a purchase for their common benefit." *Venner v. Denver Union Water Co.*, 90 P. 623, 632 (Colo. 1907). However, a fraudulent offer of partnership could be considered an attempt to avoid competition and depress the price of the property to be sold. *See Venner,* 90 P. at 632–33 ("The fact that an agreement to make a joint purchase may indirectly operate to prevent the parties thereto from bidding is not enough to render the transaction unlawful. To have that effect it must appear that the object of the agreement was to avoid competition.").

Holtz argues Daniels has not raised a genuine issue of material fact regarding fraud, irregularity, or unfairness. He points to *Buter,* in which this court did not find evidence of fraud or irregularity in a sheriff's sale. *Buter,* 212 Iowa at 679–80, 237 N.W. at 233. In *Buter,* however, the plaintiff alleged fraud and collusion between the trustees of the bank and the purchaser in a conclusory fashion. *Id.* Here, Daniels has presented admissible evidence that a bidder, Branstad, was discouraged from bidding higher based on statements by Holtz regarding problems with the stock and a false offer to become partners. Branstad testified he was concerned about potential tax issues, but that he had no intention of selling the farm if he successfully bought the ICC stock, therefore deferring the tax liability.

Although the bidding resulted in a sale price higher than the Sims appraisal, Daniels has raised a genuine issue of material fact regarding whether the sale was tainted by Holtz's interference and whether Daniels was prejudiced by Holtz's actions. On remand, the fact finder must first find whether there was irregularity, unfairness, or fraud in the sheriff's sale because of Holtz's conduct with Branstad, and if there was, whether the irregularity, unfairness, or fraud caused the corporation to be sold at a lower price. Whether the interference rises to a level necessary to

invalidate the sale is a question of fact for the fact finder, which may be influenced by the behavior of Holtz at the sale, whether Holtz truly intended to partner with Branstad, Branstad's willingness to bid higher than $110,000, and whether there was any inequity in the price for which the ICC stock actually sold. *See Nat'l Oil & Gas, Inc. v. Gingrich*, 716 N.E.2d 491, 496 (Ind. Ct. App. 1999) ("In determining whether to set aside a [sheriff's] sale, the trial court will take all relevant circumstances into consideration, including the inadequacy of the price, the effect of any procedural irregularities, inequitable conduct, evidence of mistake or misapprehension, and problems with title.").

Although the sale was above the appraisal submitted by Sims and agreed to by Shelton and Henrichsen, the evidence presented by Daniels creates a genuine issue of material fact as to whether *this particular auction* would have resulted in a higher sale price because Branstad was willing to bid higher but was unfairly induced not to bid by a false offer of partnership from Holtz. The appraisals are not the final word on the fair market price of ICC, but an effort to "prevent property going for a song at judicial sales." *See Gelfert*, 313 U.S. at 232, 61 S. Ct. at 902, 85 L. Ed. at 1303. If an auction bidder was willing to bid higher and was unfairly discouraged, the fair market value of ICC may have been higher. The price on its face is not grossly inadequate compared to the appraisals, but the question is whether Holtz's improper behavior resulted in a sale price which was unfair compared to what it would have been had Holtz refrained from his alleged interference with Branstad.

**C. Motion to Amend Petition.** Daniels filed a motion to amend his petition. The proposed amendment includes claims under Iowa Code section 602.10113 for deception and collusion against Nervig and the Brick Law Firm for alleged collusion with Holtz's actions at the sheriff's

sale. Daniels also seeks to add a cause of action against Nervig for deception under section 602.10113 for allowing Holtz to falsely testify during the WSH trial. Lastly, Daniels seeks to add claims against Nervig and the Brick Law Firm under the disciplinary rules in the Iowa Code of Professional Responsibility. The district court summarily denied the motion to amend.

> Iowa Rule of Civil Procedure 1.402(4) provides:
>
> A party may amend a pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is required and the action has not been placed upon the trial calendar, the party may so amend it at any time within 20 days after it is served. Otherwise, a party may amend a pleading only by leave of court or by written consent of the adverse party. Leave to amend, including leave to amend to conform to the proof, shall be freely given when justice so requires.

Daniels originally filed his petition on February 26, 2007. Defendants responded to the petition by filing motions for partial summary judgment on April 16. On August 10, Daniels filed a motion to amend his petition. Because the motion to amend was filed after the summary judgment motions and more than twenty days after the petition was filed, Daniels requested leave of the district court to amend his petition. The district court denied the motion, finding "no factual support for any of these claims" and that "they fail as a matter of law and fact."

We reverse a district court's denial of a motion to amend only when a clear abuse of discretion is shown. *M–Z Enters.*, 318 N.W.2d at 411. Nervig and the Brick Law Firm argue the district court did not abuse its discretion in denying the motion to amend with regard to the remaining claims because the factual and legal bases for these additional claims were the same as those contained in the original petition. Therefore, by

granting summary judgment to defendants, it was also proper to deny the motion to amend as based on the same flawed arguments.

Daniels has not appealed the district court's grant of summary judgment with regard to the claims related to the previous WSH trial. Proposed cause of action number twenty-two is based on this previous trial. Because the factual underpinnings were dismissed on summary judgment by the district court, we agree the denial of the motion to amend with respect to count twenty-two was not an abuse of discretion.

Counts nineteen, twenty, and twenty-one all allege deception or collusion under Iowa Code section 602.10113. Counts nineteen and twenty are asserted against Nervig and count twenty-one is asserted against the Brick Law Firm, Nervig's law firm. The district court did not abuse its discretion in denying the motion to amend with regard to counts nineteen, twenty, and twenty-one. Daniels appears to base his claims of collusion against Nervig and the Brick Law Firm on Nervig's presence at the sheriff's sale. The complaint, in a conclusory fashion, asserts Nervig knew or had reason to know about Holtz's action. Nervig, however, is not alleged to have gone into the backroom for the discussion between Holtz and Branstad. The district court denied the motion to amend because it found no factual support for the allegations. The district court did not abuse its discretion.

The district court also did not abuse its discretion in denying the motion to amend with respect to counts twenty-three through twenty-seven, all of which assert claims against Nervig and the Brick Law Firm based on alleged violations of the Iowa Code of Professional Responsibility for Lawyers. It is well-established that attorney disciplinary rules do not create a basis for civil liability. *Brody v. Ruby*, 267 N.W.2d 902, 907–08 (Iowa 1978) ("We hold the Iowa Code of

Professional Responsibility for Lawyers furnishes no basis for a private cause of action for negligence . . . ."); *see also* Iowa R. Prof'l Conduct 32, pmbl., ("Violation of a rule should not itself give rise to a cause of action against a lawyer nor should it create any presumption in such a case that a legal duty has been breached.").

**IV. Conclusion.**

Daniels failed to raise a genuine issue of material fact regarding whether the sheriff's sale should be set aside because his corporation, ICC, failed to receive a just appraisement. Daniels did, however, raise an issue of material fact regarding whether Holtz's actions at the sale chilled the bidding and unfairly or fraudulently caused another bidder to cease bidding and, therefore, may require a court of equity to set aside the sale. We remand for trial on this issue. The district court did not abuse its discretion in denying Daniels's motion to amend the petition.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED IN PART; REVERSED IN PART; CASE REMANDED.**