# IN THE COURT OF APPEALS OF IOWA

No. 15-0383
Filed March 22, 2017

**STEPHEN SHAWN KEYES,**
     Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
     Respondent-Appellee.
_____

Appeal from the Iowa District Court for Linn County, Marsha M. Beckelman (first motion to amend), Mary E. Chicchelly (second motion to amend), and Lars G. Anderson (trial), Judges.

Stephen Keyes appeals the denial of his application for postconviction relief (PCR), asserting that his trial counsel provided ineffective assistance and that the PCR court erred in denying his motions to amend his application. **AFFIRMED.**

Webb L. Wassmer of Wassmer Law Office, PLC, Marion, for appellant.

Thomas J. Miller, Attorney General, and Darrel Mullins, Assistant Attorney General, for appellee State.

Considered by Danilson, C.J., and Doyle and McDonald, JJ.

**DOYLE, Judge.**

A jury found Stephen Keyes guilty of two counts of first-degree murder, and he was sentenced to life in prison. We affirmed Keyes's convictions on direct appeal, but we preserved his ineffective-assistance-of-counsel claims for possible postconviction-relief (PCR) proceedings. *See State v. Keyes*, No. 97-1997, slip op. at 1-5 (Iowa Ct. App. May 26, 1999). Keyes timely filed a PCR application in 1999, but trial did not take place until 2014. The PCR court denied the application in early 2015. Keyes appeals, raising two claims: (1) trial counsel was ineffective regarding the cross-examination of Keyes's eight-year-old son, and (2) the PCR court abused its discretion in denying his motions to amend the PCR application. We conclude that Keyes did not meet his burden to prove his trial counsel was ineffective and that the PCR court did not abuse its discretion in denying his motions to amend his PCR application. We therefore affirm.

### I. Background Facts and Proceedings.

In the early morning hours of December 26, 1996, Keyes's wife, Sandra, and two-year-old son, Joshua, died in a house fire. The State accused Keyes of setting the fire to collect insurance proceeds and charged him with two counts of murder. Keyes was tried to a jury in September 1997.

Special Agent Michael Hiles was the State's chief fire investigator on the case. He testified concerning accelerant detection at the fire scene by a dog trained for this purpose. *See id.* at 2. Hiles was also allowed to demonstrate the dog's ability to detect a drop of gasoline concealed in the courtroom. *See id.* "Other inculpatory evidence included Keyes's failing marriage to Sandra, threat to kill her, and recent purchase of substantial life and renter's insurance." *Id.*

Keyes was found guilty of two counts of first-degree murder and sentenced to life in prison.  *See id.*

On direct appeal, this court concluded the State's foundation for admission of Hiles's expert testimony concerning the reaction of a dog trained in accelerant detection was sufficient.  *See id.* at 3-4.  We also found no error in the dog's in-court demonstration.  *See id.* at 5.  We affirmed Keyes's convictions and sentence and preserved for postconviction proceedings Keyes's ineffective-assistance-of-counsel claims that "his trial counsel was ineffective in (1) failing to object to evidence of [Keyes's] 'check kiting' offenses; and (2) failing to cross-examine [Keyes's] son Michael about his recall of the events surrounding the morning of the fire."  *Id.*

Keyes timely filed his pro se PCR application on November 1, 1999, setting forth three claims of ineffective assistance of counsel.  He contended his trial counsel was ineffective in (1) failing to object to evidence of other crimes, i.e., Keyes's check kiting offenses, (2) failing to cross-examine his eight-year-old son Michael concerning the boy's recall of events at the time of the fire, and (3) failing to object to the warrantless search and seizure of Keyes's clothing.  Keyes was appointed PCR counsel.  As the PCR court so aptly noted: "From there, this case . . . had a sad history of progression."  Keyes's eighth PCR counsel was appointed in April 2007.

In September 2008, PCR counsel moved for a continuance.  Counsel advised the court that "in spite of the multiple attorneys that [had] been appointed, very little was done" in the case and that he had to "essentially begin from scratch."  Due to the size and complexity of the case, counsel requested an

extension of one year to develop the PCR record. Counsel also requested depositions and preparation of transcripts at the State's expense, stating Keyes's expert had "now completed his preliminary analysis," and the case was "finally ready for depositions." The court granted Keyes's requests.

In an April 2009 motion, PCR counsel advised that Keyes had "obtained the services of a Dr. Gerald Hurst in Austin, Texas," who had worked for Keyes pro bono and "prepared a 57 page report finding significant infirmities in the arson investigation," and counsel requested funds for the expert to travel to give testimony, as well as funds for other experts. Dr. Hurst's September 3, 2008 report was attached to the motion. The report was very critical of Hiles, stating: "The origin and cause investigation in the Keyes case was an exercise based on concepts which had been long relegated to the category of old wives tales." The State resisted, but the PCR court granted funding for two of three requested experts.

At the end of 2010, PCR counsel requested another continuance and a trial-scheduling conference. Following the conference, the court entered a scheduling order setting deadlines of February 15, 2011, for amendments to pleadings and March 15, 2011, for Keyes's designation of experts. Trial was set for January 9, 2012.

On March 15, along with a designation of experts, PCR counsel filed a motion to amend the PCR application. The motion stated counsel "inadvertently tickled this deadline for March 15" and learned of the error when talking to the State's counsel. PCR counsel took full responsibility for missing the deadline by twenty-eight days and requested the fault not be placed on Keyes. PCR counsel

also stated he "had no tactical advantage for missing the deadline, and the contents of his Amended Application merely restate many of the core conclusions" of Dr. Hurst's report, which the State had had since April 2009. With the trial some ten months away, counsel believed the State had adequate time to prepare, but Keyes did not object to a continuance, including the resetting of deadlines, if the State needed additional time. The proposed amended application asserted fourteen grounds, including the original three claims of ineffective assistance of counsel. The State resisted, and the PCR court denied the motion, concluding it substantially changed the issues, prejudiced the State, and would likely require a continuance.

A status hearing was held in December 2011, and Keyes and his counsel requested the trial date be reset. The State did not resist a continuance, but it "reserved the right to object in the future to any further request by [Keyes] to amend the [application]." The court granted the motion to reset the trial date.

Another status hearing was held in June 2013, and trial was again reset— for September 2014. In July 2014, PCR counsel filed a second motion seeking to amend the PCR application. The proposed amended application raised ten grounds, including two of the original ineffective-assistance-of-counsel claims. Among other things, the motion advised that since the first motion to amend, the Iowa Fire Marshal had officially adopted National Fire Protection Association (NFPA) 921, a Guide for Fire and Explosion Investigations.[1] The State again

---

[1] NFPA 921 was in existence at the time of the Keyes's fire. When cross-examined at the murder trial, the State's fire investigator Hiles testified he did not rely upon the guidelines of NFPA 921 because NFPA was controlled by "special interest people," and "[n]ot one of the 50 State Fire Marshals [was] on the board or committee." On July 5,

resisted, and the PCR court denied the motion in August 2014 for the same reasons it stated in its prior order.

Trial commenced in September 2014 on the three ineffective-assistance-of-counsel claims asserted by Keyes in his original 1999 PCR application. The PCR court declined to reconsider the rulings previously made on the earlier motions to amend. Though the court did not consider Keyes's experts' testimony at trial, the court did permit Keyes to elicit their testimony by way of an offer of proof for appellate review. On January 30, 2015, the PCR court entered its ruling denying Keyes's ineffective-assistance-of-counsel claims.

Keyes appealed. In June 2015, the Iowa Supreme Court entered an order for limited remand to allow the PCR court to rule on Keyes's motions for a new trial and to amend or enlarge pursuant to Iowa Rule of Civil Procedure 1.904(2).[2] The PCR court denied the motions on August 24, 2015. The matter then bounced back to the supreme court and was transferred to this court in December 2016.

On appeal, Keyes argues a single ground of ineffective-assistance-of-counsel: that his trial counsel was ineffective for failing to impeach or more effectively cross-examine his then eight-year-old son about the inconsistencies in his trial testimony compared to the child's statements given to a detective the day of the fire. Keyes also argues the PCR court erred or abused its discretion when

---

2011, the Iowa State Fire Marshal adopted NFPA 921 as a guide, "except when such guidance is inapplicable or when additional or alternative investigative methods are warranted based upon the nature of the fire or explosion."

[2] Keyes's posttrial motions had not been ruled on before Keyes filed his notice of appeal.

it denied his motions to amend the PCR application. We begin with Keyes's ineffective-assistance-of-counsel claim.

## II. Ineffective Assistance of Counsel.

### A. Standard of Review and Boilerplate Law.

Though we normally review the PCR court's ruling on the application for corrections of errors at law, constitutional claims, such as those alleging ineffective assistance of counsel, are reviewed de novo. *See More v. State*, 880 N.W.2d 487, 498 (Iowa 2016); *Nguyen v. State*, 878 N.W.2d 744, 750 (Iowa 2016). To succeed on a claim of ineffective assistance of counsel, a PCR applicant "must prove by a preponderance of evidence '(1) his trial counsel failed to perform an essential duty, and (2) this failure resulted in prejudice.'" *Rhoades v. State*, 848 N.W.2d 22, 28 (Iowa 2014) (citation omitted). If Keyes cannot establish both elements, his claim fails; thus, if we find one element lacking, we need not address the other element. *See State v. Schlitter*, 881 N.W.2d 380, 388 (Iowa 2016). But if Keyes does establish both elements, meaning his counsel was ineffective, he is entitled to a new trial. *See id.* at 391. "[I]t is the applicant's burden to present facts establishing inadequate representation." *King v. State*, 797 N.W.2d 565, 571 (Iowa 2011).

"An attorney breaches an essential duty when 'counsel's representation [falls] below an objective standard of reasonableness.'" *Lado v. State*, 804 N.W.2d 248, 251 (Iowa 2011) (citation omitted). "We assess counsel's performance 'objectively by determining whether [it] was reasonable, under prevailing professional norms, considering all the circumstances.'" *Nguyen*, 878 N.W.2d at 752 (citation omitted). But, in assessing counsel's performance, "we

start with the presumption that the attorney performed his duties in a competent manner." *State v. Maxwell*, 743 N.W.2d 185, 196 (Iowa 2008). "Miscalculated trial strategies and mere mistakes in judgment normally do not rise to the level of ineffective assistance of counsel," *King*, 797 N.W.2d at 571, and "we avoid second-guessing and hindsight," *Ledezma v. State*, 626 N.W.2d 134, 142 (Iowa 2001). We are less likely to find counsel ineffective if counsel's alleged actions or inactions stem from counsel's use of judgment rather than counsel's lack of diligence. *See Lado*, 804 N.W.2d at 251. "[W]e look to the facts of the case to determine whether there was a lack of diligence." *King*, 797 N.W.2d at 571 (citation omitted). "Clearly, there is a greater tendency for courts to find ineffective assistance when there has been 'an abdication—not exercise— of . . . professional [responsibility].'" *Lado*, 804 N.W.2d at 251 (citation omitted). "In the end, the inquiry is transformed into an individualized fact-based analysis." *Ledezma*, 626 N.W.2d at 142. "Counsel's unprofessional errors resulting in the mere impairment of presenting the defense is not sufficiently prejudicial." *State v. Clay*, 824 N.W.2d 488, 496 (Iowa 2012).

### *B. Analysis.*

Keyes asserts one ineffective-assistance-of-counsel claim on appeal. The PCR court succinctly set forth that claim as follows:

> In his [application], Keyes claims that "[t]rial counsel erred when failing to cross-examine [his] son, Michael, concerning his recall of events at the time of the fire . . . . Essentially, trial counsel could have impeached [Keyes's son] but instead decided not to engage in cross-examination . . . . Michael's testimony could have been impeached, especially where it suggested [Keyes] did not attempt to remove his wife and another child from the flames of the burning house." At trial and in posttrial briefs, Keyes expands on this and takes issue with three separate statements made by

Michael at trial, all of which were allegedly contradicted by statements made by Michael to [a detective] shortly after the fire.

First, at trial Michael was asked: "While you were walking down the stairs, Mike, and going towards the door, did you ever hear your dad yell for your mom?" Michael replied, "No." [The report of the detective that] interviewed Michael on December 26, 1996, shortly after the fire . . . indicate[d] "Michael said he heard his father calling to his mother, but 'Mommy didn't answer.' [Michael] thought that his mother was still sleeping because he never saw her."

Second, Michael was asked at trial: "When did you first realize the house was on fire?" He replied, "When we got into the van." He told [the detective] that "they went to the back door but there was fire so they went to the front door."

Lastly, at trial Michael was asked: "When he woke you up by pulling on your shirt, did he say anything?" Michael replied, "No." The [detective's] report indicates that Michael said "[h]is daddy shook me and yelled to get up."

Keyes asserts that Michael's testimony was very important at trial. [The prosecutor] who prosecuted the case against Keyes, testified in the [PCR] proceedings that he thought Michael's testimony was one of the more important pieces of evidence in the case. He highlighted Michael's testimony at trial and contrasted it with statements made by Keyes as part of his closing argument.

At the PCR hearing, though trial counsel testified that he did not know of a tactical reason he would not have impeached Michael's testimony, his testimony at the hearing was given more than a decade after the trial. Trial counsel testified he was an experienced attorney, and "it didn't sound like [him] to miss something like that." We agree with the PCR court's assessment:

The court does not construe [trial counsel's] admission to be nearly as broad as argued by Keyes. [Trial counsel] testified that as he sat there almost eighteen years later, he could not recall any strategic or tactical justification, and that with hindsight being 20\20, he perhaps should have impeached Michael at the time. This is a far cry from admitting that at the time he had no strategic or tactical justification.

. . . .

When it comes to cross-examination of children, courts have noted the difficulties faced by defense counsel and the fine line that defense counsel walks—an overly aggressive cross-examination runs the risk of alienating the jury and generating hostility toward

the defendant. *See State v. DeLeon*, 337 N.W.2d 635, 641 (Wis. Ct. App. 1985) ("This failure to impeach can be justified as a legitimate trial tactic. Impeaching a child witness with a prior inconsistent statement is a double-edged sword—it may cast doubt upon the child's credibility; on the other hand, it may cast both the defendant and defense counsel in a negative light.") . . . .

In this case, not surprisingly, [trial counsel] had no independent recollection of Michael's testimony at the criminal trial or his strategy. [Trial counsel] testified that in his experience with children witnesses, a case-by-case determination had to be made regarding how aggressively to cross-examine them and whether or not to try and impeached their testimony. He did, in fact, conduct a cross-examination of Michael. Looking at it in full, it is clear that [trial counsel] was delicate in his cross-examination, but he was also trying and able to make certain points helpful to Keyes, including that Michael was a hard sleeper and often groggy when he woke up. [Trial counsel] referenced this in his closing statement. It is clear that [trial counsel] had a strategy and purpose with his cross-examination of Michael.

Looking at the case eighteen years later, it may be easy to say that a different strategy would have worked better, but that is not the applicable standard. Under these facts and circumstances, the court cannot say that trial counsel's cross-examination of then eight-year-old Michael Keyes was outside of the range of competent legal assistance.

Keyes's ineffective-assistance-of-counsel claim fails as a matter of law. We therefore proceed to the second point—whether the PCR court erred in denying his motions to amend.

### III. Motions to Amend.

Keyes also argues the PCR court erred or abused its discretion when it denied his motions to amend his PCR application. On appeal, Keyes asserts the first motion to amend was largely based on Dr. Hurst's 2008 report.[3] The second motion to amend "raised largely the same issues as the first," but it also included

---

[3] Keyes makes no argument on appeal concerning any of the other new grounds raised in his first amended application.

the Iowa State Fire Marshal's adoption of NFPA 921 as "newly discovered evidence."

### A. *Standard of Review.*

We review the denial of a request to amend a pleading for an abuse of discretion. *See Tomka v. Hoechst Celanese Corp.*, 528 N.W.2d 103, 108 (Iowa 1995). "An abuse of discretion occurs when the trial court 'exercises its discretion on grounds clearly untenable or to an extent clearly unreasonable.'" *State v. Greene*, 592 N.W.2d 24, 27 (Iowa 1999) (quoting *State v. Smith*, 522 N.W.2d 591, 593 (Iowa 1994)). "A postconviction action based on newly discovered evidence is reviewed for correction of errors at law." *More*, 880 N.W.2d at 498.

### B. *Analysis.*

### 1. *PCR Procedures.*

PCR proceedings are civil actions triable at law, and the rules of civil procedure apply. *See Jones v. State*, 545 N.W.2d 313, 314 (Iowa 1996); *see also Jack v. P & A Farms, Ltd.*, 822 N.W.2d 511, 517-18 (Iowa 2012) (citing Iowa Code § 822.7). To commence PCR proceedings, the PCR applicant must file a verified application "within three years from the date the conviction or decision is final or, in the event of an appeal, from the date the writ of procedendo is issued" unless the applicant is asserting "a ground of fact or law that could not have been raised within the applicable time period." Iowa Code § 822.3 (1999); *see also id.* § 822.4; *Nguyen v. State*, 829 N.W.2d 183, 187 (Iowa 2013). But:

> All grounds for relief available to an applicant under [chapter 822] must be raised in the applicant's original, supplemental or amended application. Any ground finally adjudicated or not raised,

or knowingly, voluntarily, and intelligently waived in the proceeding that resulted in the conviction or sentence, or in any other proceeding the applicant has taken to secure relief, may not be the basis for a subsequent application, unless the court finds a ground for relief asserted which for sufficient reason was not asserted or was inadequately raised in the original, supplemental, or amended application.

Iowa Code § 822.8. "Within thirty days after the docketing of the [PCR] application, or within any further time the court may fix, the [S]tate *shall respond* by answer or by motion." *Id.* § 822.6 (emphasis added). A PCR court can "make appropriate orders for amendment of the application or any pleading or motion, for pleading over, for filing further pleadings or motions, or for extending the time of the filing of any pleading." *Id.*

### 2. Rules of Civil Procedure and Case Law.

In addition to the procedures contemplated in chapter 822, Iowa Rule of Civil Procedure 1.402(4) expressly permits a party to

amend a pleading as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is required and the action has not been placed upon the trial calendar, the party may so amend it at any time within [twenty] days after it is served. Otherwise, a party may amend a pleading *only by leave of court* or by written consent of the adverse party. Leave to amend, including leave to amend to conform to the proof, *shall be freely given when justice so requires*.

(Emphasis added.) Our supreme court has long found that "amendments should be the rule and denial should be the exception." *Baker v. City of Iowa City*, 867 N.W.2d 44, 51 (Iowa 2015); *see also Ackerman v. Lauver*, 242 N.W.2d 342, 345 (Iowa 1976). Amendments should be granted "so long as the amendment does not substantially change the issues in the case" or "if the opposing party is not prejudiced or unfairly surprised" by the substantial change. *Baker*, 867 N.W.2d

at 51. Moreover, amendments can be made at any stage of the litigation, even at trial in certain circumstances. *See id.*; *see also Rife v. D.T. Corner, Inc.*, 641 N.W.2d 761, 767 (Iowa 2002). Nevertheless, "[d]istrict courts have considerable discretion to allow amendments at any point in the litigation," and appellate courts should "only reverse the district court's decision if it has abused that discretion." *Baker*, 867 N.W.2d at 51; *see also Daniels v. Holtz*, 794 N.W.2d 813, 824 (Iowa 2010). An "[a]buse of discretion may be shown where there is no record to support the court's factual conclusions, or where the decision is grounded on reasons that are clearly untenable or unreasonable." *Office of Citizens' Aide/Ombudsman v. Edwards*, 825 N.W.2d 8, 14 (Iowa 2012). If the court's reasoning is based on an erroneous application of the law, it is untenable. *See Sioux Pharm, Inc. v. Eagle Labs., Inc.*, 865 N.W.2d 528, 535 (Iowa 2015).

### a. First Motion to Amend.

The underlying PCR proceedings in Keyes's case languished for many, many years. Although it had plenty of opportunity to do so, the State never filed an answer to the original PCR application as required by section 822.6. So, at least up to the deadline set by the January 2011 scheduling order, Keyes was free to amend his application "at any time" as a matter of course. *See* Iowa R. Civ. P. 1.402(4). And, his amendment would relate back to the original pleading if the claims set forth therein "arose out of the conduct, transaction, or occurrence set forth . . . in the original pleading." Iowa R. Civ. P. 1.402(5). Additionally, in the PCR court's January 2011 scheduling order, the court noted that after an "extensive discussion between counsel and the court . . . there was a consensus related to the deadlines which are set in this order." Clearly, the State agreed

Keyes could amend his petition up to at least February 15, 2011. But once the scheduling order deadline to file amendments passed, as it did, Keyes no longer had free reign to file an amendment to his PCR application. *See* Iowa R. Civ. P. 1.602(2)(4) (allowing the court to set time limits for amending pleadings).

Due to a calendaring error, Keyes's counsel missed the deadline to file the amended application by twenty-eight days. There can be no question that the amended application substantially changed the issues in the case. The crux of Keyes's amended application is Dr. Hurst's opinion that Special Agent Hiles's fire investigation was flawed in numerous respects.[4] Dr. Hurst's September 3, 2008 fifty-seven page report was provided to the State as early as April 2009. The State certainly had no problem with Keyes amending his application by February 15, 2011—some eleven months before the scheduled January 9, 2012 trial—and in fact it agreed he could do so. It strains credulity to believe the State was suddenly prejudiced when the motion to amend was filed just twenty-eight days late—still some ten months before trial. Additionally, Keyes and his counsel even agreed to continue the trial if the State believed it needed additional time. The

---

[4] Keyes also claimed there was new scientific evidence surrounding cause and origin investigations of suspected arson cases. Keyes claimed that since his conviction, the U.S. Department of Justice (DOJ) issued a report in June 2000 stating NFPA 921 had "become the benchmark for the training and expertise of everyone who purports to be an expert in the origin and cause determination of fires." He also noted the National Academy of Sciences (NAS) published a 2009 report revealing significant deficiencies in forensic science as a whole—and fire science specifically—and he noted the NAS report confirmed the NFPA as foundational on fire science. The recommendations of the NFPA 921 are the minimal standards for performing fire investigations, which included disapproval of the use of canine detection of accelerants. Keyes contended the State had not adopted such standards at the time of his trial, and in fact discredited the NFPA standards. Keyes noted Special Agent Hiles used a canine trained to detect accelerants during his investigation. Keyes asserted that, since some of Hiles's investigative techniques have since been replaced with new scientific techniques, the arson investigation which resulted in his conviction was flawed.

State made no showing of prejudice or unfair surprise in the PCR proceeding. Under *Baker*, it would appear the amendment could have been granted. *See* 867 N.W.2d at 51 (stating an amendment is not prohibited "if the opposing party is not prejudiced or unfairly surprised" by the substantial change). But prejudice is not the only factor we consider in our analysis.

The proposed amended application would have substantially changed the issues to be tried. Keyes or his PCR counsel knew of the potential for asserting the claims related to Dr. Hurst's report as early as 2008 and yet failed to assert them until more than two-and-one-half years later. The PCR court concluded that neither Keyes nor his PCR counsel presented any valid reason

> to have waited until this stage of litigation to present the proposed amended claims. [The State] asserted that [Keyes] would have been aware of the conclusions of Dr. Hurst since at least April 23, 2009;[5] [Keyes] does not dispute this assertion. [Keyes] did not meet even the generous deadline included in the January 25, 2011 Scheduling Order.

Our supreme court has held that a district court did not abuse its discretion in denying a proposed amendment where a party knew of the potential for asserting a claim but did not do so until more than a year later. *See Glenn v. Carlstrom*, 556 N.W.2d 800, 804 (Iowa 1996). Keyes had known of Dr. Hurst's report for years before filing his motion to amend. The same is true for the reports concerning NFPA 921 by the DOJ—released in 2000—and the NAS—reported in 2009.[6] For the reasons expressed in *Glenn*, we conclude the PCR court did not abuse its discretion in denying Keyes's first motion to amend.

---

[5] Dr. Hurst's report is dated September 3, 2008. A copy was provided to the State with Keyes's April 2009 motion for expenses.
[6] *See* footnote 4.

**b. Second Motion to Amend.**

In July 2014, just two months before trial, Keyes's counsel filed a second motion seeking to amend Keyes's PCR application. Among other things, the motion asserted newly discovered evidence, namely, the adoption of NFPA 921 by the Iowa Fire Marshal on July 5, 2011. The State again resisted and requested the motion be denied for the reasons set forth in the court's prior ruling denying Keyes's first motion to amend. The PCR court denied the motion in August 2014. It found the proposed amendment substantially changed the issues and prejudiced the State. The court concluded "Keyes has not set forth any valid reason for either counsel or Keyes to have waited until this stage of litigation, just before trial, to raise these issues." Specifically, the court noted that although Iowa adopted NFPA 921 on July 5, 2011, and that Keyes had personal knowledge of this fact by January 2012, Keyes provided no reason as to why he waited until July 5, 2014, to file the motion to amend. For the reasons expressed in *Glenn*, we conclude the PCR court did not abuse its discretion in denying Keyes's second motion to amend. *See id.*

**c. NFPA 921 as Newly Discovered Evidence.**

Even had Keyes timely filed a motion to amend, would the NFPA 921 issue be considered "newly discovered evidence?" We think not.

In order for Keyes to prevail in his PCR action because of newly discovered evidence, he must show:

> (1) that the evidence was discovered after the verdict; (2) that it could not have been discovered earlier in the exercise of due diligence; (3) that the evidence is material to the issues in the case and not merely cumulative or impeaching; and (4) that the evidence

probably would have changed the result of the trial. *More*, 880 N.W.2d at 499 (citations omitted). The standard for whether the evidence probably would have changed the result is a high one. *See id.*

NFPA 921 was considered controversial at the time of Keyes's 1997 trial. It is certainly true that the 2000 DOJ report, which stated NFPA 921 had "become the benchmark for the training and expertise of everyone who purports to be an expert in the origin and cause determination of fires," is evidence that could not have been discovered at the time of Keyes's 1997 criminal trial. The same is true for the 2009 NAS report revealing significant deficiencies in forensic science as a whole—and fire science specifically—as well as confirming NFPA as foundational on fire science. Likewise for Iowa's adoption of NFPA 921 in 2011. "While each marginal advance in science cannot form the basis of a new trial, watershed developments are a different story." *Id.* at 509. We do not view the general acceptance of NFPA 921 over the years to be a "watershed development." We conclude this evidence is cumulative or impeaching—not newly discovered evidence. Nevertheless, we proceed to examine whether Keyes has shown a reasonable probability that the result of his criminal trial would have been different with this evidence. This inquiry is whether, based upon all the evidence, the verdict probably would have been different in the case before us. *See id.* at 510.

Based upon our review of the entire record, we conclude Keyes has not met the high standard of showing that the verdict would have been different based on the claimed newly discovered evidence concerning NFPA 921. It was undisputed the origin of the fire was the garage. However, causation of the fire—

accident or arson—was the issue before the jury, and NFPA 921 was discussed at length there. To recount all the trial testimony and evidence here would unduly lengthen this opinion. In this case, the State's witness Special Agent Hiles opined the fire was intentionally set with the use of an accelerant.

In Keyes's defense, an expert testified about changes that had been made in how arson is investigated and the conclusions that could be drawn from certain fire evidence under NFPA 921. The expert was critical of the State's investigation of the fire, opining that "reliable procedures were not used" in investigating the fire. He believed arson with use of an accelerant was predetermined from the start of the investigation and only the things that might support that opinion were looked at in the investigation. He believed there was no objective evidence presented that showed that an accelerant was present. He said none of the samples showed an accelerant as being there, and in his opinion, that was the only thing that could be used "as to say whether an accelerant was there or not." He believed the wiring, the fluorescent light, and the freezer as possible ignition sources were not fully investigated to rule them out as the cause of the fire. He opined that "at this stage of the investigation" the cause of the fire was "undetermined." This conclusion is no different than Dr. Hurst's conclusion.

Other evidence—both direct and circumstantial—contradicted Keyes's story. This evidence included Keyes's own inconsistent statements, observations of the fire and of Keyes by eyewitnesses, medical evidence indicating minimal smoke inhalation, location of smoke detectors found in the home, and Keyes's postfire behavior and demeanor. Other evidence pointed to

motive, including Keyes's poor treatment of his wife, his relationship with another woman, his financial woes, and his recent purchase of renter's insurance.  There was also testimony by a jailhouse informant who said Keyes told him how he set the fire.

Keyes had the motive and means; he was at the right place at the right time, and his behavior generally points in the direction of guilt.  We recognize that the fire investigation may have been flawed and that any singular piece of evidence in isolation may not have been convincing, but it was the combination of facts and circumstances that strongly point toward Keyes's guilt.

Based upon all the above, we conclude the PCR court did not abuse its discretion in denying Keyes's motions to amend his application for postconviction relief.

### IV. Conclusion.

Because Keyes cannot establish his trial counsel breach a duty in his representation of him, Keyes's ineffective-assistance-of-counsel claim fails as a matter of law.  Additionally, the PCR did not abuse its discretion when it denied Keyes's motions to amend.  Accordingly, we affirm the ruling of the PCR court denying and dismissing Keyes's PCR application.

**AFFIRMED.**