# In the Iowa Supreme Court

No. 24–0828

Submitted October 7, 2025—Filed November 21, 2025

**Sandra K. Mormann,** individually and as administrator of the **Estate of Augustin G. Mormann,** and **Daniel J. Mormann,** individually,

Appellees,

vs.

**City of Manchester, Iowa,** and **James Louis Wessels,**

Appellants.

Appeal from the Iowa District Court for Delaware County, Thomas A. Bitter, judge.

A city and its former police officer appeal on multiple grounds from the judgment on a jury award of $4.25 million in compensatory damages and $10,000 in punitive damages for assault and battery during the officer's pursuit of a motorcyclist. **Affirmed.**

Waterman, J., delivered the opinion of the court, in which all justices joined.

David T. Bower (argued) and Logan J. Eliasen of Nyemaster Goode, P.C., Des Moines, and Timothy Clausen, Douglas Phillips, and Zachary Clausen of Klass Law, L.L.P., Sioux City, for appellants.

David A. O'Brien (argued) of Dave O'Brien Law, Cedar Rapids, and Haytham Faraj of Law Offices of Haytham Faraj, PLLC, Chicago, IL, for appellees.

**Waterman, Justice.**

This case arises from a high-speed police chase that ended in a motorcycle wreck near Manchester, Iowa. The wreck left the motorcyclist with severe injuries, to which he later succumbed. The motorcyclist's estate sued the city of Manchester and James Wessels, the Manchester police officer involved in the crash. The jury awarded $4.25 million in compensatory damages and $10,000 in punitive damages. Wessels and the City appeal on numerous grounds. For the following reasons, we affirm the judgment on the jury verdict.

## I. Background Facts and Proceedings.

We review the facts in the light most favorable to the verdict. *Snipes v. Chi., Cent. & Pac. R.R. Co.*, 484 N.W.2d 162, 165 (Iowa 1992).

In the afternoon of December 10, 2020, Iowa State Trooper Eric Payne was driving his marked squad car eastbound on Highway 20 near Manchester. Payne encountered a motorcycle speeding in the opposite direction at ninety-nine miles per hour; the posted speed limit was sixty-five miles per hour. Changing course, Payne approached the motorcycle from behind and activated his cruiser-mounted lights and sirens. The motorcyclist slowed his vehicle and took an off-ramp; then, feigning a right turn, he veered to the left and took the on-ramp back onto Highway 20. The motorcyclist, with Payne in pursuit, sped down Highway 20, eventually taking Exit 282 toward Delaware, Iowa. At the end of the off-ramp, the motorcyclist once again took the on-ramp and re-entered the highway. To evade Payne, the motorcyclist weaved through traffic, passing in the middle lane and dodging other police cruisers that had joined the chase.

The motorcyclist took Exit 277 toward Manchester. The posted speed limit was thirty-five miles per hour; the motorcyclist was driving about seventy miles per hour. Payne slowed his pursuit, but the motorcyclist continued through

Manchester's residential neighborhoods and down Main Street. Because of increasing traffic and the danger that a high-speed chase created for pedestrians and other drivers, Payne disengaged pursuit and tailed the motorcycle from a distance.

As the motorcyclist sped through downtown Manchester, Lieutenant James Wessels, a Manchester police officer, drove his cruiser into the gap between Payne and the motorcycle. Wessels activated his cruiser's lights and sirens and commenced his own pursuit, following the motorcyclist closely through Manchester and onto the surrounding county highways. Unlike Trooper Payne, who recorded his chase on his dashcam, Wessels never activated his dash- or body-mounted cameras, despite his department's policy requiring such recordings.

The parties dispute what happened following Wessels's pursuit. But all agree that Wessels reached speeds over one-hundred miles per hour as he chased the motorcyclist on 165th Street, a county road with low rises and blind turns. Cresting one of the rises, Wessels came suddenly upon the motorcyclist, who had slowed to about sixty-two miles per hour—seven miles per hour faster than the posted speed limit. To avoid a collision, Wessels veered into the left lane to pass. At some point during that maneuver, Wessels's right rearview mirror struck the motorcyclist. Just beyond the point where Wessels began his initial pass, 165th Street angles to the left, creating a blind turn. Fearing that he might collide with as-yet-unseen traffic, Wessels steered his cruiser back into the right lane and decelerated just in front of the motorcyclist. The motorcyclist, unable to stop in time, caromed off the left quarter panel of Wessels's cruiser, lost control, and crashed into the ditch, where he lay, face down and motionless.

Shortly after the collision, Payne and other officers arrived at the scene. The motorcyclist was breathing but unresponsive. After a few minutes, he regained consciousness and began screaming. Officers rolled him onto his back and awaited medical support. At that point, several officers recognized him as Augustin G. Mormann.

At the scene of Mormann's wreck, officers worried that he had a spinal injury, so they were reticent to move him. Ultimately, Mormann was airlifted to the University of Iowa Hospitals & Clinics. Nurses took a sample of his urine, which tested positive for amphetamine, a metabolite of methamphetamine. This result indicated that he had used methamphetamine sometime within the preceding three days. Treating doctors determined that Mormann had fractured his fourth, fifth, and sixth cervical vertebrae. The prognosis: he was permanently paralyzed from the neck down.

For more than a month after the wreck, ventilators and feeding tubes kept Mormann alive. But on January 12, 2021, he told his parents he wanted to be removed from life support. The family discussed the decision and made arrangements for his funeral. Two days later, Mormann was removed from life support. He lingered for a little over thirty hours, during which time he told his mother, "I got ran off the road, pushed off the road at a high rate of speed." On January 15, he passed away. He was thirty-one years old.

Mormann's parents began investigating the crash. Mormann's father called Manchester Police Chief Dan Hauschild, who assured him that the crash was captured on video and that the recordings would be turned over to the Iowa State Patrol. That was not true. Hauschild, for almost a month after Mormann's death, concealed from Mormann's parents and the Iowa State Patrol the fact that

Wessels had not activated his dash- or body-mounted cameras during the chase, as required by department policy.

On May 20, Mormann's parents filed this civil action. Their initial petition alleged the following claims against Wessels and the city of Manchester: "Use of Excessive Force Article I, Section 8 of the Iowa Constitution"; "Substantive Due Process Article I, Section 9 of the Iowa Constitution"; "Depriving Mormann of Enjoying and Defending Life and Liberty, Acquiring, Possessing and Protecting Property and Pursuing and Obtaining Safety and Happiness - Article I, Section I of the Iowa Constitution"; "Wrongful Death"; and "Loss of Consortium."

In June, the Iowa Legislature enacted legislation that was later codified as Iowa Code section 670.4A (2022). 2021 Iowa Acts ch. 183, § 14. That law granted qualified immunity to municipal employees under certain circumstances, and it imposed a heightened pleading standard for claims to which its qualified immunity applied. *See* Iowa Code § 670.4A.

The parties engaged in discovery, and the Mormanns, on April 11, 2022, filed their first amended petition. This petition added two claims (1) "Conspiracy to Cover Up Wessels's Murder of Mormann Against Defendants Wessels and Hauschild" and (2) "Violation of Article I, Section 2 of the Iowa Constitution – Iowa Code Section 22 - Failure to Maintain Records and Spoliation - Iowa Constitutional, Statutory and Common Law Against Defendants Wessels, Hauschild, Peters and City of Manchester." Several months later, the Mormanns dismissed their claims against Chief Hauschild.

On May 5, 2023, this court decided *Burnett v. Smith,* 990 N.W.2d 289 (Iowa 2023). *Burnett* reshaped the legal landscape. Six years earlier, in a sharply divided 2017 opinion, our court held for the first time that certain provisions of the Iowa Constitution created implied private rights of action for money damages,

notwithstanding that article XII, section 1 of the Iowa Constitution expressly empowered the legislature alone to "pass all laws necessary to carry this Constitution into effect." *See Godfrey v. State*, 898 N.W.2d 844, 847 (Iowa 2017), *overruled by, Burnett*, 990 N.W.2d 289. *Burnett* recognized the unconstitutionality and unwieldiness of the *Godfrey* regime and restored our jurisprudence to the *status quo ante. Burnett*, 990 N.W.2d at 298.

Recognizing the change in the law and its impact on the Mormanns' case, the district court, upon the defendants' motion, granted summary judgment dismissing their claims under article I, sections 1, 2, and 9 of the Iowa Constitution. Wessels and the City then filed another motion for summary judgment on the Mormanns' claim under article I, section 8 of the Iowa Constitution, arguing that *Burnett* foreclosed that cause of action as well. The district court granted that motion.

In early March 2024, the court conducted several hearings on pretrial motions that addressed issues germane to this appeal. First, the defendants argued that the district court should not permit the plaintiffs to submit claims for common law assault and battery because those counts were not specifically pleaded in either the petition or the amended petition. The district court reserved its ruling until the end of the jury trial but noted that the plaintiffs had consistently alleged that Wessels intentionally ran Mormann off the road.

Second, the court granted the defendants' motion to bifurcate the compensatory and punitive damages phases of the trial.

Finally, the court reserved for trial its ruling on whether Mormann's statements at the hospital were admissible as dying declarations.

The jury trial began on March 14. Over the next eight days, the plaintiffs put on their case to prove that Wessels, in trying to stop Mormann's flight,

intentionally struck the motorcycle. To support their position, the Mormanns called numerous witnesses, including: (1) Jonathan Piersch, an officer with the Manchester Police Department; (2) Trooper Payne; (3) Geoffrey Alpert, an expert in police pursuit policies; and (4) Daniel Billington, an expert accident reconstructionist.

Piersch testified that on the day of the wreck, he joined the other officers as they pursued Mormann. Unlike Wessels, when Piersch first entered his cruiser, he logged into the vehicle-mounted computer system and ensured that his dash-mounted camera was operational. Piersch stated that he took this step because under department policy, "We're expected to have them [dashcams] recording, we're expected to have them on." He also explained that when he heard the state troopers call off the pursuit, he disengaged and deactivated his front-facing pursuit lights, again in accord with the department's pursuit policy.

Trooper Payne testified that as the initial pursuit moved into Manchester, he called off the chase because of the risk it posed to the motorcyclist and to any pedestrians in Manchester—in Payne's words, "the juice wasn't worth the squeeze." He further stated that according to Iowa Highway Patrol pursuit policy, car-to-motorcycle contact is not an appropriate way to stop a fleeing motorcyclist except in those limited circumstances where policy authorizes use of deadly force.

Alpert, relying on his expertise in the field of police pursuits, testified that in some cases, extending a police pursuit only increases the risk of negative outcomes. Reviewing the chase video and Mormann's criminal actions, Alpert concluded that deadly force was not warranted in this case. He further stated that Wessels's decision to extend his pursuit increased the danger of and ultimately resulted in an adverse outcome. In Alpert's view, "If Lieutenant

Wessels had not continued the chase, it's very unlikely that we'd be here [in trial]."

Billington, an expert in accident reconstruction, testified that in his opinion, Wessels intentionally collided with Mormann's motorcycle. He further stated that Mormann's body directly contacted Wessels's cruiser. In other words, markings on the car resulted from contact with his body, not merely from the vehicle-to-vehicle impact. Mormann's mother testified about his dying declaration.

The defendants argued that Wessels was duty-bound to continue his pursuit and that Mormann was to blame for the crash. At the close of evidence, the plaintiffs opted to submit only their assault and battery claims; they did not submit their recklessness claim because the district court made clear it would be met with an instruction on a comparative fault defense. The court denied the defendants' motions for directed verdict.

The jury was instructed on assault, battery, and the justification defense. The assault instruction read:

> An assault is committed when a person does an act which is intended to put another in fear of physical pain or injury which a reasonable person would deem insulting or offensive, and the victim reasonably believes that the act may be carried out immediately.
>
> In order to prove their claim of assault, the Mormanns must prove all of the following propositions:
>
> 1. Lt. Wessels did an act by which he intended to put Gus Mormann in fear of physical pain or injury.
>
> 2. A reasonable person would deem Wessels' act insulting or offensive.
>
> 3. Mormann reasonably believed that the act would be carried out immediately.
>
> 4. Wessels' act was a cause of damage.

5. The amount of damage.

If the Mormanns failed to prove any of these propositions, they are not entitled to damages on their claim of assault. If the Mormanns proved these propositions, then you will consider the defense of "justification," as explained in Instruction No. 14.

The battery instruction read:

A battery is committed when a person intentionally does:

1. An act resulting in bodily contact causing physical pain or injury, or

2. An act which results in bodily contact which a reasonable person would deem insulting or offensive.

In order to prove their claim of battery, the Mormanns must prove all of the following propositions:

1. Wessels intentionally struck Mormann's motorcycle with his police cruiser.

Intent means doing something on purpose as opposed to accidentally. Because intent requires a finding of what a person is thinking when doing an act, it is seldom capable of being proven by direct evidence. You may use your common experience when considering all of the facts surrounding the doing of an act to determine what a person's intent was when committing the act. You may find that if a person does an act on purpose, the person also intended the natural results of the act.

2. Wessels' act resulted in physical pain or injury to Gus Mormann.

3. Wessels' act was a cause of damage.

4. The amount of damage.

If the Mormanns failed to prove any of these propositions, they are not entitled to damages on their claim of battery. If the Mormanns proved each of these propositions, then you will consider the defense of justification, as explained in Instruction No. 14.

Finally, the justification instruction provided:

Plaintiffs allege Defendant Wessels engaged in assault and battery against Gus Mormann. Defendant Wessels was, at all times material hereto, a peace officer. A peace officer, while making a lawful arrest, is justified in the use of any force which the peace

officer reasonably believes to be necessary to effect the arrest or to defend any person from bodily harm while making the arrest. However, the use of deadly force is only justified when a person cannot be captured any other way and either the person has used or threatened to use deadly force in committing a felony or the peace officer reasonably believes the person would use deadly force against any person unless immediately apprehended.

To determine whether the force used was reasonable, you must determine whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting the officer, without regard to his underlying intent or motivation.

If you find that Defendant Wessels reasonably believed the force he used was necessary to arrest Gus Mormann and/or to defend any person from bodily harm, you must find for the Defendants and against the Plaintiffs on Plaintiffs' claim of assault and battery.

The defendants objected to submission of the assault and battery claims but did not object to the specific wording of these instructions.

The jury returned a verdict finding that Wessels committed an assault and battery against Mormann. The jury awarded $4.25 million in compensatory damages against the City and Wessels. In a supplemental verdict in the second phase of the bifurcated trial, the same jury found that Wessels acted in willful, wanton, and reckless disregard for Mormann's rights and safety and awarded an additional $10,000 in punitive damages against Wessels individually. The district court denied the defendants' posttrial motions for judgment notwithstanding the verdict (JNOV) or for a new trial.

The defendants appealed, assigning the following errors: (1) the district court erred by denying Wessels qualified immunity under section 670.4(1)(*k*) of the Iowa Municipal Tort Claims Act (IMTCA), (2) the court erred by submitting claims for assault and battery because they were inadequately pleaded, (3) the court erred by finding a jury question on assault and battery, (4) the court improperly admitted Mormann's statements in the hospital as a dying

declaration, (5) the court improperly allowed evidence about the Manchester police department's internal policies and about Wessels's lack of dashcam or bodycam video, and (6) the court improperly determined that the plaintiffs had sufficient evidence to submit their claim for punitive damages to the jury. We retained the case.

While the defendants' appeal was pending, we decided *Doe v. West Dubuque Community School District*, holding that Iowa Code section 670.4A's heightened pleading standard and qualified immunity do not apply to common law tort claims—for example, assault and battery. 20 N.W.3d 798, 806–08 (Iowa 2025). We invited the parties to submit supplemental briefing. In their supplemental brief, the defendants conceded that *Doe* foreclosed their heightened pleading and immunity argument, and they withdrew it.

**II. Standard of Review.**

"We review a district court's ruling on a motion for judgment notwithstanding the verdict for errors at law." *Smith v. Iowa State Univ. of Sci. & Tech.*, 851 N.W.2d 1, 18 (Iowa 2014). We must decide "whether there was sufficient evidence to justify submitting the case to the jury when viewing the evidence in the light most favorable to the nonmoving party," *id.* (quoting *Van Sickle Constr. Co. v. Wachovia Com. Mortg., Inc.*, 783 N.W.2d 684, 687 (Iowa 2010)), which means substantial evidence to support "each element of the plaintiff's claim," *id.* "[E]vidence is substantial if 'reasonable minds would accept the evidence as adequate to reach the same findings.' " *Id.* (quoting *Doe v. Cent. Iowa Health Sys.*, 766 N.W.2d 787, 790 (Iowa 2009)).

We review rulings on motions to amend the pleadings for abuse of discretion. *Struve v. Struve*, 930 N.W.2d 368, 375 (Iowa 2019). We will reverse a

ruling on a motion to amend only "where a clear abuse of discretion is shown." *Daniels v. Holtz*, 794 N.W.2d 813, 817 (Iowa 2010).

We review hearsay rulings for correction of errors at law and will reverse the admission of hearsay evidence as prejudicial unless it is shown to be harmless. *State v. Elliott*, 806 N.W.2d 660, 667 (Iowa 2011). The burden to demonstrate that the admission was harmless rests with the proponent of the evidence. *See Tarbox ex rel. S.K. v. Obstetric & Gynecologic Assocs. of Iowa City & Coralville, P.C.*, 13 N.W.3d 546, 554–55 (Iowa 2024); *see also State v. Pirie*, 18 N.W.3d 238, 246 (Iowa 2025) (same). We review all other evidentiary rulings for abuse of discretion. *Elliott* 806 N.W.2d at 667.

**III. Analysis.**

**A. Emergency Response Immunity.** We begin by noting that the Mormanns raised a constitutional challenge to the emergency response immunity in Iowa Code section 670.4(1)(*k*), and that we directed the parties to file supplemental briefs addressing our adjudication of constitutional claims in *Sikora v. State*, 23 N.W.3d 300, 305–09 (Iowa 2025), among other issues. "Ordinarily, we look to statutory issues first in order to avoid unnecessary constitutional questions." *Simmons v. State Pub. Def.*, 791 N.W.2d 69, 73–74 (Iowa 2010). This principle dovetails with our preference to "decide cases on statutory grounds to avoid constitutional infirmities." *Id.* at 74. "[W]e are constrained by our principles of self-restraint, including the longstanding rule that we will not decide constitutional questions when a case can be resolved on other grounds." *State v. Williams*, 695 N.W.2d 23, 30 (Iowa 2005). Because we resolve this immunity issue under the statute, "we adhere to the time-honored doctrine of constitutional avoidance." *Good v. Iowa Dep't of Hum. Servs.*, 924 N.W.2d 853, 863 (Iowa 2019).

Turning to the statutory defense, the defendants argue that the district court erred by failing to dismiss this action based on the emergency response immunity codified in section 670.4(1)(*k*) of the IMTCA.[1] The Mormanns argue that the emergency response immunity is defeated when, as here, the jury finds that the police officer was reckless in continuing his pursuit under Iowa Code section 321.231(5) (2021). That section provides, "The provisions of this section shall not relieve the driver of an authorized emergency vehicle . . . from the duty to drive . . . with due regard for the safety of all persons, nor shall such provisions protect the driver . . . from the consequences of the driver's . . . reckless disregard for the safety of others."[2] These statutes must be read together. *See Hoffert v. Luze*, 578 N.W.2d 681, 682–83 (Iowa 1998).

The IMTCA is "viewed as abolishing traditional common law immunities." *Thomas v. Gavin*, 838 N.W.2d 518, 521 (Iowa 2013); *see also Venckus v. City of Iowa City*, 930 N.W.2d 792, 809 (Iowa 2019) ("[The IMTCA] allows people to assert claims against municipalities, their officers, and their employees that otherwise would have been barred by the doctrine of sovereign immunity."). Section 2 of the IMTCA states, "Except as otherwise provided in this chapter, every municipality is subject to liability for its torts and those of its officers and employees, acting within the scope of their employment or duties . . . ." Iowa Code § 670.2. The IMTCA broadly defines "tort" as follows:

> [E]very civil wrong which results in wrongful death or injury to person or injury to property or injury to personal or property rights and includes but is not restricted to actions based upon negligence; error or omission; nuisance; breach of duty, whether statutory or

---

[1] Iowa Code section 670.12 extends the immunity protection to individual officers and employees of the City.

[2] Effective May 24, 2022, subsection (5) was renumbered to subsection (6). See 2022 Iowa Acts ch. 1087, § 3 (codified at Iowa Code § 321.231(6) (2023)). We use the version of the statute in effect when this lawsuit was filed in 2021.

other duty or denial or impairment of any right under any constitutional provision, statute or rule of law.

*Id.* § 670.1(4). Both assault and battery are common law torts that fall within this definition. Although the State Tort Claims Act codifies immunities for assault and battery, *see id.* § 669.14(4), the IMTCA does not, *see Gavin*, 838 N.W.2d at 522.

The defendants rely on the IMTCA's emergency response immunity in section 670.4(1)(*k*), which provides in pertinent part:

> 1. The liability imposed by section 670.2 shall have no application to any claim enumerated in this section. As to any of the following claims, *a municipality shall be liable only to the extent liability may be imposed by the express statute dealing with such claims* and, in the absence of such express statute, the municipality shall be immune from liability:
>
> . . . .
>
> *k.* A claim based upon or arising out of an act or omission of a municipality in connection with *an emergency response* . . . .

Iowa Code § 670.4(1)(*k*) (emphases added). According to the defendants, Wessels's tortious acts arose in the context of an emergency response (i.e., his pursuit of Gus Mormann). Therefore, they contend, the district court erred when it submitted the Mormanns' assault and battery claims to the jury and when it denied their motions for directed verdict and JNOV.

For their part, the Mormanns argue that the district court properly submitted the assault and battery claims because Iowa Code section 321.231 is an express statute dealing with emergency police chases, *see id.* § 321.231(1), and because it allows tort liability when the emergency responder acted with "reckless disregard for the safety of others," *id.* § 321.231(5). The Mormanns argue that in their case, at least, the recklessness requirement is satisfied because the jury in its supplemental verdict found that Wessels acted with

reckless disregard for Mormann's safety. Relying on section 321.231(5) and *Hoffert v. Luze*, 578 N.W.2d at 684–85, the Mormanns argue, "Iowa Code § 670.4(1)(*k*) was never intended to protect emergency responders, like Wessels, who violate the rules of the road in a reckless manner."

The defendants respond that section 321.231 merely exempts emergency responders from certain rules of the road and sets a higher culpability standard of recklessness for common law liability claims. In the defendants' view, section 321.231 does not operate to statutorily "impose" liability and therefore does not qualify as "an express statute dealing with such claims" within the meaning of section 670.4(1) to supersede the emergency response immunity under section 670.4(1)(*k*). Our precedent has rejected the defendants' interpretation. We construed sections 670.4(1) and 321.231 together in *Hoffert*, 578 N.W.2d at 682–83. We determined that "section 321.231 is an express statute dealing with claims regarding emergency response vehicles" and thereby creates an exception to the emergency response immunity codified in section 670.4(1)(*k*). *Id.* at 683; *see also* Iowa Code § 4.7 (requiring us to construe the provisions of specific statutes as exceptions to those of general statutes). We held that liability may be imposed under section 321.231 upon proof of recklessness, notwithstanding the IMTCA's emergency response immunity. *Hoffert*, 578 N.W.2d at 684–85 (explaining that "it is the manner of driving" that triggers section 321.231 liability and that "the level of culpability to retain the statutorily granted immunity is negligence").

We adhere to our holding in *Hoffert*. We do not read section 670.4(1) as requiring that the other statute technically *create* the liability through a private statutory cause of action; it is enough that the statute *expressly recognizes the existence of the liability*, as section 321.231(5) does. Additionally, we have

reaffirmed *Hoffert* in two recent cases. *See Penny v. City of Winterset*, 999 N.W.2d 650, 653 (Iowa 2023) (stating that the legal standard of care for claims brought against an officer engaged in an emergency response was recklessness); *Martinez v. State*, 986 N.W.2d 121, 124 (Iowa 2023) (same). We therefore decline to revisit *Hoffert. See Book v. Doublestar Dongfeng Tyre Co.*, 860 N.W.2d 576, 594 (Iowa 2015) ("Stare decisis alone dictates continued adherence to our precedent absent a compelling reason to change the law.").

To avoid liability under section 321.231, the defendants rely heavily on an unpublished decision of the court of appeals, *Christiansen v. Eral*, No. 22–1971, 2024 WL 108848 (Iowa Ct. App. Jan. 10, 2024). That case involved a police chase in 2019 that ended when the pursuing officer "performed a Pursuit Intervention Technique (PIT) maneuver by using his patrol vehicle to collide with the rear of Christiansen's vehicle." *Id.* at *1 (footnote omitted). The plaintiff was driving a truck, *id.*, not a motorcycle. The district court granted the defendants' motion to dismiss on grounds including the emergency response immunity in section 670.4(1)(*k*). *Id.* at *2. The court of appeals affirmed and rejected the plaintiff's argument that he could recover under "the express statute dealing with such claims"—section 321.231. *Id.* at *5–6 (emphasis omitted) (quoting Iowa Code § 670.4(1)(*k*) (2019)). The appellate court concluded that section 321.231 did not apply because it did not mention PIT maneuvers until a 2022 amendment that did not apply retroactively:

> The Court acknowledges, without so finding, that after the 2022 amendment to section 321.231, the current statute may well be 'an express statute dealing with such claims' as are enumerated in section 670.4(1), but finds that as the statute existed in June of 2019 it was not such an express statute and therefore it does not preempt any immunity imposed by section 670.4(1).

*Id.* at *6.

In urging us to follow *Christiansen*, the defendants note that the Mormanns described Wessels's impact with Mormann's motorcycle as a PIT maneuver in this 2021 collision, before the 2022 amendment to section 321.231 went into effect. Yet the defendants themselves vigorously disputed that characterization of the collisions. And Wessels in his trial testimony denied causing the collision and never claimed he performed a PIT maneuver. We follow our own binding precedent—*Hoffert*—not the nonprecedential and distinguishable decision in *Christiansen*.

Iowa Code section 321.231 imposes a higher standard of proof on plaintiffs than mere negligence. We have stated:

> In order to prove recklessness as the basis for a duty under section 321.231(3)(*b*), we hold that a plaintiff must show that the actor has intentionally done an act of an unreasonable character in disregard of a risk known to or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow.

*Morris v. Leaf*, 534 N.W.2d 388, 391 (Iowa 1995); *see also Penny*, 999 N.W.2d at 653 (same); *Martinez*, 986 N.W.2d at 124 ("An emergency vehicle operator who harms another person by driving with reckless disregard for the safety of others thus may be held liable for civil damages [under section 321.231(5)].").

The trial was bifurcated, on the defendants' motion, into compensatory and punitive damages phases. The defendants note the district court did not give the jury a recklessness instruction during the compensatory damages phase, and without the requisite jury finding that Wessels was reckless, they argue that they were entitled to a directed verdict under section 670.4(1)(*k*)'s emergency response immunity. Yet during the subsequent punitive damages phase, the same jury received the following instruction:

> Punitive damages may be awarded if the plaintiff has proven by a preponderance of clear, convincing, and satisfactory evidence

that the conduct of Lt. Wessels was willful, wanton, and reckless by intentionally doing an act of an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow, and which thus is usually accompanied by a conscious indifference to the consequences.

The jury returned a supplemental verdict finding that "the conduct of Lt. Wessels constituted willful, wanton, and reckless disregard for the rights or safety of another," specifically, Gus Mormann. But for the defendants' successful motion to bifurcate the punitive damage phase of the trial, the jury would have returned its verdict on recklessness together with its verdict on assault and battery. We discern no error attributable to the staggered sequence of these verdicts resulting from the bifurcation that the defendants themselves requested.

We hold that the jury's supplemental verdict finding that Wessels acted recklessly toward the motorcyclist defeats the defendants' emergency response immunity. The district court correctly rejected the defendants' emergency response immunity claims in denying their motion for JNOV.

**B. Failure to Plead Assault and Battery.** For their second argument, the defendants level two attacks at the Mormanns' pleadings. Originally, they contended that Iowa Code section 670.4A(3) (2022) required the Mormanns to plead their claims with particularity. After our court held that section 670.4A(3) does not apply to common law tort claims, *see Doe*, 20 N.W.3d at 806–08, the defendants abandoned this argument in their supplemental brief.

The defendants press their second attack, namely that the district court erred when it found that the petition adequately notified the defendants of the Mormanns' assault and battery claims. The defendants note: (1) that neither the original nor the amended petition mention the words "assault" or "battery," and (2) that the Mormanns first disclosed their intent to submit assault and battery

claims one week before trial. In other words, the Mormanns pleaded too little, and they pleaded it too late.

Iowa is a notice pleading state, meaning:

> The petition need not allege ultimate facts that support each element of the cause of action. And the petition need not identify a specific legal theory. Instead, the petition need only contain factual allegations that give the defendant "fair notice" of the claim asserted so the defendant can adequately respond to the petition. A petition complies with the 'fair notice' requirement if it informs the defendant of the incident giving rise to the claim and of the claim's general nature.

*Terrace Hill Soc'y Found. v. Terrace Hill Comm'n*, 6 N.W.3d 290, 296 (Iowa 2024) (citation modified). If the Mormanns' petition meets those requirements, then it adequately pleaded a claim for assault and battery.

From the inception of this case to the jury verdict, the Mormanns have made consistent allegations:

- Lieutenant Wessels chased Mormann's motorcycle.

- In the course of the chase, Wessels twice struck Mormann's motorcycle.

- The twin impacts were intentional or reckless, and they caused Mormann to crash his motorcycle.

- The crash injured Mormann.

- Mormann died of his injuries.

These allegations informed the defendants of the events from which the claims arose, described the nature of the claims, and provided a foundation for investigation and discovery if the defendants needed to further crystallize the Mormanns' position. Indeed, the district court acknowledged the longstanding nature of the Mormanns' factual claims, writing,

> Throughout the pendency of this case, Plaintiffs have repeatedly asserted a belief that Mormann was assaulted by Officer Wessels when Mormann's motorcycle was allegedly run off the road

by Wessels. That allegation is certainly not new, and allowing Plaintiffs to pursue such a claim at trial will not add any additional witnesses or evidence.

We agree with the district court's finding that the defendants were not caught unawares by the Mormanns' assault and battery allegations—those claims were in the lawsuit from its inception. The initial pleadings alleged constitutional violations of excessive force, and excessive force cases are the "functional equivalent" of assault and battery claims. *Wagner v. State*, 952 N.W.2d 853, 855 (Iowa 2020). The defendants have failed to show unfair prejudice or surprise.

The defendants rely on an unpublished federal district court decision that denied leave to amend common law assault and battery claims in an excessive force case after *Burnett* eliminated the plaintiffs' state constitutional claims: *Klum v. City of Davenport*, No. 3:23–cv–00043–RGE–WPK, 2024 WL 2880640, at *13 (S.D. Iowa May 30, 2024). That the *Klum* court exercised its discretion to deny the amendment does not persuade us that the Iowa district court abused its discretion to allow the assault and battery claims.

The defendants claim prejudice because they had counted on submission of a comparative fault instruction based on Mormann's negligence in fleeing the police at high speeds while under the influence of methamphetamine. A jury finding that Mormann was more than fifty percent at fault would have barred his recovery for negligence. Iowa Code § 668.3(1)(*a*) (2021). But the comparative fault defense against torts included in Iowa's Comparative Fault Act is not available against intentional torts such as assault and battery. *See Mulhern v. Cath. Health Initiatives*, 799 N.W.2d 104, 116 n.2 (Iowa 2011) (recognizing that under Iowa law, "comparative negligence is not a defense to an intentional tort"); *Carson v. Webb*, 486 N.W.2d 278, 280 (Iowa 1992) (holding that the Comparative Fault Act is inapplicable to assault and battery claims); *Godbersen v. Miller*,

439 N.W.2d 206, 209 (Iowa 1989) (holding that "comparative fault principles . . . have no application to a claim of punitive damages" arising out of a vehicular assault).

The plaintiffs are "the master of [their] own pleadings." *Haskenhoff v. Homeland Energy Sols.*, LLC, 897 N.W.2d 553, 579 (Iowa 2017). And the plaintiffs, as masters of their pleadings, "may intentionally craft [their] petition to avoid" a defense. *Grimm v. US W. Commc'ns, Inc.*, 644 N.W.2d 8, 14 (Iowa 2002). Importantly, the defendants cannot say what they would have done differently if the Mormanns had expressly alleged assault and battery claims earlier. The defendants knew all along that this was an excessive force case and cannot show any unfair prejudice. *See Rife v. D.T. Corner, Inc.*, 641 N.W.2d 761, 767 (Iowa 2002) ("Even an amendment that substantially changes the issues may still be allowed if the opposing party is not prejudiced or unfairly surprised."); *see also* Iowa R. Civ. P. 1.402(4) ("Leave to amend, including leave to amend to conform to the proof, shall be freely given when justice so requires.").

Given the absence of unfair surprise or prejudice, we conclude that the defendants have not shown the district court abused its discretion in submitting the assault and battery claims at trial.

**C. Sufficiency of the Evidence: Assault and Battery.** Wessels and the City next contend that the Mormanns failed to present enough evidence to generate a jury question on either their assault or battery claims. We view the evidence in the light most favorable to the verdict. *Smith*, 851 N.W.2d at 18.

Civil assault comprises the following elements: "(1) an act intended to put another in fear of physical pain or injury; [or] (2) an act intended to put another in fear of physical contact which a reasonable person would deem insulting or offensive; and the victim reasonably believes that the act may be carried out

immediately." *Greenland v. Fairtron Corp.*, 500 N.W.2d 36, 38 n.4 (Iowa 1993) (alteration in original) (quoting Iowa State Bar Ass'n, Iowa Civil Jury Instruction 1900.2).

The defendants argue there was no substantial evidence that Mormann "reasonably believed that an offensive act may be carried out." They focus their fire on the "the victim reasonably believes" element. They contend that there was insufficient evidence to prove that Mormann was aware of an impending impact. If he was not aware, their argument continues, then there was nothing for the jury to consider because the Mormanns' assault claim was legally deficient. We disagree.

The evidence at trial, taken in the light most favorable to the verdict, demonstrated that shortly before the fatal collision, Wessels drove past and struck Mormann's motorcycle. The initial impact, the fatal impact moments later, and Wessels's sudden braking in the interim gave Mormann reason to anticipate an offensive contact. A reasonable jury could find that Mormann reasonably anticipated such contact.

Turning to the battery claim, "[a] person is subject to liability to another for battery if that person acts intending to cause a harmful contact with the person of the other and a harmful contact results." *Carter v. Carter*, 957 N.W.2d 623, 635 (Iowa 2021) (quoting *Nelson v. Winnebago Indus., Inc.*, 619 N.W.2d 385, 388 (Iowa 2000) (en banc), *abrogated by*, *Mehmedovic v. Tyson Foods, Inc.*, 21 N.W.3d 412, 426–27 (Iowa 2025)). The testimony of the plaintiffs' accident reconstructionist and the physical evidence are sufficient to prove Wessels intentionally used his cruiser to twice collide with the motorcyclist and ran him off the road, resulting in fatal injuries. Expert testimony that the circumstances

did not warrant the use of deadly force supports the jury's rejection of the defense that Wessels's conduct was justified.

The defendants claim that the evidence is insufficient to prove the "harmful contact with the *person* of the other" element. In their view, the offensive contact in this case was car-to-motorcycle. If there was no contact between the cruiser and Mormann's person, then there was no battery—or so goes their argument.

There are several problems with the defendants' position. First, their cited authority fails to support the premise that car-to-motorcycle contact does not constitute battery. They rely solely on an unpublished, nonprecedential decision of the Washington Court of Appeals, *Childress v. Boeing Aerospace Operations, Inc.*, No. 78233–9–I, 2019 WL 1902767 (Wash. Ct. App. April 29, 2019). In that case, a security guard slapped or punched Childress's Jeep. *Id.* at *1. Childress sued for battery, claiming that the Jeep was part of his "person." *Id.* at *2–3. The trial court dismissed the claim, and Childress appealed. *Id.* at *1. Childress relied on the Restatement (Second) of Torts section 18 cmt. c, at 31 (A.L.I. 1965), which states:

> Unpermitted and intentional contacts with anything so connected with the body as to be customarily regarded as part of the other's person and therefore as partaking of its inviolability is actionable as an offensive contact with his person. There are some things such as clothing or a cane or, indeed, anything directly grasped by the hand which are so intimately connected with one's body as to be universally regarded as part of the person. . . . Thus, the ordinary man might well regard a horse upon which he is riding as part of his personality but, a passenger in a public omnibus or other conveyance would clearly not be entitled so to regard the vehicle merely because he was seated in it.

Likening his Jeep to a horse, Childress argued that the security guard's punching of the vehicle constituted battery. *Childress*, 2019 WL 1902767 at *3. The court of appeals agreed with the broad principle of the Restatement but

noted that a car is not similar to a horse. *Id.* It affirmed the trial court's order, which stated in relevant part:

> [H]orses could be the subject of a battery because the person on a horse is intimately connected with the animal. It is hard to think of any place one could strike a horse and not physically endanger the person on the horse, because horses don't like being struck. That's well known. They buck. They run. They throw off the person that is on the horse. Cars, fortunately, do not do these things, and that's why horses aren't cars, and cars aren't horses when it comes to the tort of battery.

*Id.* (citation modified). The relevant point was that striking the horse would also "physically endanger the person on the horse" because of the horse's likely reaction. *Id.* The same could not be said about the security guard slamming his fist on the hood of the plaintiff's Jeep. This is consistent with the Restatement, which recognizes that offensive contact can be indirect. *See* Restatement (Second) of Torts § 18(1), at 30 ("An actor is subject to liability to another for battery if (a) he acts intending to cause a harmful or offensive contact with the person of the other . . . and (b) an offensive contact with the person of the other directly or *indirectly* results." (emphasis added)). Indeed, Maryland's highest court reinstated a civil battery claim when a police cruiser struck a motorcycle in hot pursuit. *Beall v. Holloway-Johnson*, 130 A.3d 406, 416–17 (Md. 2016) ("The contact may be direct or indirect, but it must be intended. It is clear that '[a] person can use an automobile or other vehicle to intentionally hit another person,' but, in order for that to constitute civil battery, the element of intent must be present." (citation omitted) (quoting *Hendrix v. Burns*, 43 A.3d 415, 428 (Md. Ct. Spec. App. 2012))). *Childress* is distinguishable.

Other courts have held that vehicle-to-vehicle contact can constitute battery. *See, e.g., People v. Dealba*, 195 Cal. Rptr. 3d 848, 856–57 (Ct. App. 2015) (affirming a conviction for spousal battery where the defendant crashed his car

into the side of his ex-wife's car); *Clark v. State*, 783 So. 2d 967, 969 (Fla. 2001) (affirming a conviction for criminal battery where the defendant intentionally drove his truck into an occupied vehicle, causing it to spin around); *State v. Townsend*, 865 P.2d 972, 976–77 (Idaho 1993) (holding that a jury could find that an intentional collision between the defendant's vehicle and his wife's could constitute battery).

We need not decide today whether a car-to-motorcycle contact can constitute a battery because the evidence supports a finding that Wessels's cruiser struck Mormann's body. The Mormanns' expert witness, Billington, testified about Mormann's arm or elbow striking the left quarter panel of Wessels's cruiser:

> That mark is, however, very consistent with marks we see in cases where pedestrians come in contact with moving vehicles. And I can speak to that with some absolute certainty because I've been struck several times by vehicles while working either privately or with law enforcement. That mark is consistent with Mr. Mormann's arm or elbow area, something on that right side of his body making contact with the vehicle as the bike rode up and over that wheel. That dent, the indentation, the black mark, is consistent with the clothing he's wearing as well.
>
> . . . .
>
> . . . So what I'm saying is that the arm of the driver or some other portion of the body that's on that right side of the operator of the motorcycle is causing an indentation as those two vehicles come together, so as the squad is being steered to the left and striking the motorcycle, Mr. Mormann's body is ultimately going to be exposed to that vehicle which causes this indentation we see in the image on the screen. Ultimately after that, the bike capsizes and falls to the ground.

This testimony provided the jury with a foothold from which to infer that Wessels's cruiser made a "harmful contact" with Mormann's body. We hold that

there was sufficient evidence to support the jury's conclusion that Wessels assaulted and battered Mormann.

**D. Dying Declaration.** The defendants argue that they are entitled to a new trial because the district court erred when it found that statements Mormann made to his mother before he died qualified as "dying declarations," which are excepted from the rule against hearsay. *See* Iowa R. Evid. 5.804(*b*)(2).

As Mormann was lying in his hospital bed after his breathing tube had been removed, he spoke to his mother, Sandra, saying, "I got ran off the road, pushed off the road at a high rate of speed." At trial, over the objection of defense counsel, Sandra relayed these statements to the jury.

The defendants assert that the district court erred by admitting this testimony. They argue that Mormann's decision to turn off life-supporting measures was tantamount to suicide; that had he changed his mind, he could have turned his life support back on, preventing his death; and that his statement was not about the "cause and circumstances" of his death, meaning it does not qualify under the dying declaration hearsay exception.

Hearsay is a person's written or oral assertion (or nonverbal conduct intended as an assertion) that (1) "[t]he declarant does not make while testifying at the current trial or hearing" and that (2) "[a] party offers into evidence to prove the truth of the matter asserted in the statement." *Id.* r. 5.801(*c*). Hearsay is inadmissible unless an exception applies. *Id.* r. 5.802. In this case, Mormann made the disputed statement in the hospital, and his mother offered it as proof that Wessels ran him off the road. In other words, the statement was hearsay.

However, our inquiry does not end here, for the rules of evidence contain numerous exceptions to the general prohibition against hearsay. Relevant here is the exception for a "statement under the belief of imminent death"—more

commonly called the dying declaration exception. *Id.* r. 5.804(*b*)(2). Because it is presumed that those who are about to die have little reason to fabricate testimony, courts treat dying declarations as reliable enough to escape the rule against hearsay. Dying declarations are admissible when three criteria are present: (1) the declarant is unavailable, *id.* r. 5.804(*a*); (2) the declarant makes the statement while believing his death to be imminent, *id.* r. 5.804(*b*)(2); and (3) the statement is made about the cause or circumstances of the declarant's death, *id.* Additionally, "[I]t must satisfactorily appear from the declarant's express language or inferences fairly drawn from [the declarant's] condition that his sense of impending death was so certain that he was without hope or expectation of recovery." *Bratton v. Bond*, 408 N.W.2d 39, 45 (Iowa 1987).

Beginning with unavailability, Mormann was dead at the time of trial, meaning he was unavailable under Iowa Rule of Evidence 5.804(*a*)(4).

Next, Mormann made his statement with imminent apprehension of his demise; he spoke to his mother after his life support had been removed—he knew he had hours, not days. The defendants argue that he chose to die; therefore, the court should not impute reliability to his statements. They liken his statements to those contained in a suicide note, and they point out that other courts do not grant a presumption of truthfulness to statements made in apprehension of suicide. *See, e.g.*, *Kincaid v. Kincaid*, 127 Cal. Rptr. 3d 863, 874 (Ct. App. 2011) ("Similarly, courts have found that the presumption that one tells the truth in his or her final moments is not as applicable when it is death by suicide."). Because Mormann chose to die, the defendants contend, the district court erred in finding his statements to be reliable enough to escape the operation of the rule against hearsay. We disagree.

First, the text of the Iowa Rule of Evidence 5.804(*b*)(2) draws no express distinction between causes of death. It only requires that the statement be made in apprehension of death and relate to the cause and circumstances of the death. There is no textual Velcro on which to stick a rule that excludes statements made prior to intentional death but admits those made before deaths resulting from other causes.

Even if suicide notes were not covered by rule 5.804(*b*)(2)—an issue we leave for another day—Mormann's death was different from a suicide. Mormann was permanently paralyzed from the neck down, he was unable to communicate except in short bursts of intense effort, and he was—without external interventions—going to perish by natural causes. Our caselaw supports the distinction between deaths resulting from the choice to forgo life support and those from suicide. In *Polk County Sheriff v. Iowa District Court*, we held that the jailors properly compelled an inmate to undergo kidney dialysis. 594 N.W.2d 421, 427–28 (Iowa 1999) (en banc). As we explained,

> There is a distinction
>
>> between a person suffering from a serious life-threatening disease or debilitating injury who rejects medical intervention that only prolongs but never cures the affliction and an individual who deliberately sets in motion a course of events aimed at his or her own demise and attempts to enlist the assistance of others.
>
> [*Thor v. Super. Ct.*, 855 P.2d 375, 385 (1993) (en banc)]. In the former case, we may presume the patient's motive is not to commit suicide; in the latter, the motive is clearly to commit suicide.
>
> *In re Caulk* is a good illustration of a state's interest in preventing suicide. 125 N.H. 226, 480 A.2d 93 (1984). There, the prisoner went on a hunger strike because he wanted to die. He simply did not want to spend the rest of his life in prison. Rejecting

the prisoner's contention that he was allowing himself to die rather than committing suicide, the court reasoned:

> This is not a situation where an individual facing death from a terminal illness, chooses to avoid extraordinary and heroic measures to prolong his life, albeit for a short duration. Rather, the defendant has set the death-producing agent in motion with the specific intent of causing his own death. Thus, in these circumstances, the State's interest in preserving life and preventing suicide dominates.

*Id.* at 97 (citations omitted).

*Polk County Sheriff*, 594 N.W.2d at 427. This reasoning applies with equal force here. Mormann's choice to discontinue life support rather than to live as a quadriplegic does not equate to suicide.

Additionally, a declarant can be found to have a sense of impending death even while receiving life-sustaining care. *See Welch v. Willis-Knighton Pierremont*, 56 So. 3d 242, 251–52 (La. Ct. App. 2010) (finding apprehension of death due to patient's poor medical prognosis and her use of a ventilator). That Mormann could have reneged on his choice to cancel life-sustaining care leaves intact (1) the possibility that discontinuing life support may place the declarant in apprehension of death, and (2) the impending sense of death an individual may experience even while receiving life-sustaining care for fatal injuries. At bottom, it is the shadow of looming death that focuses the declarant's mind and strips away artifice.

The defendants further argue that Mormann's statement was not about the "cause and circumstances" of his death. They assert that although the crash caused his hospitalization, his choice to remove life-supporting care *caused* his death. So, his statements about the crash were not statements about the cause and circumstances of his death, and, therefore, they do not qualify as dying declarations. Again, we disagree.

Mormann's statement was about the crash. The crash caused his injuries. His injuries were ultimately fatal. True, he chose to remove life support, but that was his right. *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 278 (1990) ("The principle that a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment may be inferred from our prior decisions."). And, although his choice to turn off life support was the proximate link in the causal chain of his death, the crash was the hook from which the whole chain hangs. After all, removal of life support merely allowed the injuries caused by the crash to take their natural course. We determine that his statement regarding the crash was: (1) made in imminent apprehension of death, and (2) related to the cause and circumstances of his death. We affirm the district court's ruling admitting Mormann's statements as a dying declaration.

**E. Admission of Police Department Bodycam Policies.** For their penultimate argument, the defendants assert that the district court abused its discretion when it permitted the plaintiffs to admit evidence of the Manchester Police Department's policies regarding dashcam and bodycam video recording. They argue that the fact that Wessels never activated his cruiser- or body-mounted cameras should have been excluded from evidence as unfairly prejudicial under Iowa Rule of Evidence 5.403 because it permitted the jurors to draw illegitimate inferences about his intent. We find no abuse of discretion in admitting this evidence.

Evidence is relevant if it: (1) "[i]t has any tendency to make a fact more or less probable than it would be without the evidence" and (2) "[t]he fact is of consequence in determining the action." Iowa R. Evid 5.401. Relevant evidence is generally admissible. *Id.* r. 5.402. However, if the unfair prejudice engendered

by the evidence or its risk of confusing the jury outweighs its probative value, then the district court may exclude it. *Id.* r. 5.403.

Wessels's failure to comply with Manchester Police Department policies goes to the issue of intent. A reasonable jury could infer that Wessels meant to avoid creating a record of his actions during the pursuit by failing to activate his recording devices—a step he might take if he planned to use intentional force to stop the motorcyclist. In similar contexts, federal appellate courts have found no error in the district court's admission of internal police department policies into evidence. For example, in *United States v. Rodella*, 804 F.3d 1317, 1338 (10th Cir. 2015), the Tenth Circuit Court of Appeals affirmed the district court's admission of testimony from the instructor of an "Emergency Vehicle Operator Course" who "explained that among law enforcement officials, the word 'pursuit' is a term of art that requires the use of authorized emergency vehicles and 'would include some type of visible lights in the front, visible lights coming out the back, and then some type of . . . auditory signal, such as a siren'" and who also "explained some of the principles of pursuit he taught during [the] course, including not to pull in front of or alongside a suspect vehicle, and to maintain a large cushion of space, including a minimum of five to seven car lengths, between the patrol car and the suspect vehicle." *Id.* (omission in original).

The Seventh Circuit Court of Appeals has succinctly described the chain of reasoning that makes evidence of internal police department policies relevant:

> Those decisions [affirming the admission of police department policy evidence as a marker of intent], expressly or impliedly, acknowledge that an officer's training can help inform his state of mind in certain circumstances. If, for example, an officer has been trained that officers should do certain things when confronted with tense situations, and he does those things, the fact that he acted in accordance with his training could make it less likely that he acted willfully. And vice versa: If, as here, an officer has been trained that officers should not do several things when confronted with tense

> situations, yet he does those things anyway, the fact that he broke from his training could make it more likely that he acted willfully. The district court correctly accounted for both sides of the coin, admitting both Proano's and the government's proposed training-related evidence.

*United States v. Proano*, 912 F.3d 431, 439 (7th Cir. 2019) (citation omitted). Just so here: the Manchester Police Department had a policy regarding video recording, Wessels knew of that policy, and, on the day of the crash, Wessels violated that policy. This evidence is relevant to his intent.

With respect to the question of whether the probative value of the policy evidence is substantially outweighed by its prejudicial effect, we have established a two-step framework. "First, the district court should consider the probative value of the challenged evidence. Second, the court balances the probative value against the danger of its prejudicial effect. The burden is on the moving party to establish the grounds for exclusion." *State v. Liggins*, 978 N.W.2d 406, 422 (Iowa 2022) (citations omitted). "Unfair prejudice arises when the evidence prompts the jury to make a decision on an improper basis." *Id.* We will only overturn the district court's ruling if it "engages in an act or omission that is clearly untenable or unreasonable." *Id.* As noted above, the Manchester Police Department policies were relevant to prove Wessels's intent. We find no reason to hold that this evidence confused the issues, inflamed the jury's passions, or in any way unfairly prejudiced the defendants. The district court did not abuse its discretion in admitting evidence of the policies.

**F. Sufficiency of the Evidence: Punitive Damages.** Finally, Wessels argues that there was insufficient evidence to support a jury finding that he acted with "willful and wanton disregard for the safety of others." We view the evidence in the light most favorable to the verdict. *Smith*, 851 N.W.2d at 18.

The evidence showed that Wessels persisted in his own pursuit—in violation of department policy—after the other officers had called off the chase, it showed that he traveled at a high rate of speed in areas of low visibility, it showed that Wessels slowed suddenly at the time of the crash, and it showed that Wessels's cruiser hit Mormann's motorcycle twice intentionally, without justification for using that deadly force. A reasonable jury could infer—as this jury did—that Wessels intentionally and with "willful and wanton disregard for the safety of others" struck Mormann's motorcycle, causing his death. The district court correctly denied Wessels's motion for JNOV on this ground.

**IV. Conclusion.**

For the foregoing reasons, we affirm the district court's judgment.

**Affirmed.**